# In The Matter Of:

*THOMAS HARVEY vs.*
*THE KROGER CO.*

---

*The remote video-conference deposition of HAL SILCOX, MD*
*October 5, 2021*

---

*Ansley Court Reporting*
*1579 Monroe Drive, Suite F-342*
*Atlanta, Georgia  30324*
*(404) 210-6977*
*www.ansleycourtreporting.com*

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOMAS HARVEY,                    )
                                  )
        Plaintiff,                )        CIVIL ACTION FILE
                                  )        NO.: 1:20-CV-04803 - CAP
VS.                               )
                                  )
THE KROGER CO.,                   )
                                  )
        Defendant.                )

        The remote video-conference deposition of HAL SILCOX,
M.D., taken for the purposes stated herein; all formalities
waived, excluding the reading and signing of the deposition,
before Carin M. Holmes, Court Reporter in and for the State
of Georgia, commencing at 3:16 p.m., Tuesday, October 5,
2021.

ANSLEY COURT REPORTING, LLC
Certified Court Reporters
Carin M. Holmes, CVR
1579 Monroe Drive
Suite F-342
Atlanta, Georgia 30324
(404) 210-6977
www.ansleycourtreporting.com

2

REMOTE APPEARANCES


ON BEHALF OF THE PLAINTIFF:

        THE YASHINSKY LAW GROUP, LLC
        BY:  JEFFREY P. YASHINSKY, ESQUIRE
        295 West Crossville Road
        Building 600
        Suite 610
        Roswell, Georgia  30075
        (770) 691-8100
        (470) 397-0471, Facsimile
        Email: jeff@yashinskylaw.com


ON BEHALF OF THE DEFENDANT:

        GRAY, RUST, ST. AMAND, MOFFETT & BRIESKE, LLP
        CHRISTOPHER J. PERNICIARO, ESQUIRE
        1700 Atlanta Plaza
        950 East Paces Ferry Road NE
        Atlanta, Georgia  30326
        (404) 870-7448
        (404) 870-1031, Facsimile
        Email: cperniciaro@grsmb.com


ALSO PRESENT:

        George Bush, Videographer
        Atlanta Legal Media, LLC
        3355 Lenox Road
        Suite 750
        Atlanta, Georgia  30326
        (404) 803-9290
        video@atlantalegalmedia.com

# I N D E X

                                                                Page

Cross-Examination by Mr. Yashinsky..................11


# E X H I B I T S

| Exhibit | Description | Page Marked/ Identified |
|---------|-------------|-------------------------|
| P-1 | Deposition Notice and Notice To Produce | 38/37 |
| P-2 | Fee Schedule Produced by Defense Counsel | 38/37 |
| P-3 | Dr. Silcox's Written Report | 38/37 |

# T R A N S C R I P T  C O D E S:

\--    interruption/change in thought

...    incomplete thought

(sic) denotes word/phrase that may seem strange or incorrect has been written verbatim

(ph)  phonetically spelled

(pixelated audio)  denotes that the videoconferencing audio feed was momentarily disrupted or degraded

(inaudible) denotes that the speaker's voice was not audibly conveyed by the videoconferencing audio feed

4

P R O C E E D I N G S

1

2                                                          3:16 p.m.

3            (Whereupon, the court reporter

4       complied with the requirements of

5       O.C.G.A. §9-11-28(c).)

6            VIDEOGRAPHER:  We are on the record

7       at 3:16 p.m.

8            MR. YASHINSKY:  All right.  Does

9       anybody have anything to say before I

10      begin?

11           COURT REPORTER:  Jeff, do you want

12      me to make the stipulation that I'm

13      swearing in Dr. Wilcox from a remote

14      location?

15           MR. YASHINSKY:  Yeah.  That would be

16      great.  Thanks, Carin.

17           COURT REPORTER:  Okay.  All right.

18      So now that we're on the record, I'd just

19      like to stipulate there are no objections

20      to me swearing in Ms. -- Dr. Silcox from

21      a remote -- a remote location.

22           MR. YASHINSKY:  No objections from

23      Plaintiff.

24           MR. PERNICIARO:  No objections for

25      the Defendant.

1          (Witness sworn.)

2          MR. YASHINSKY:  Good afternoon,

3     Dr. Silcox.

4          THE WITNESS:  Afternoon.

5          MR. YASHINSKY:  My name is Jeff

6     Yashinsky.  I'm the Attorney for Thomas

7     Harvey in the case versus Kroger that

8     you're here to testify about.  The

9     purpose of this deposition is for

10    discovery and to talk to you a little bit

11    about the report that you've provided and

12    your testimony that is anticipated to be

13    provided in this case.  If at any point I

14    ask you a question that's hard to hear or

15    confusing, just let me know and I'll try

16    and rephrase it and make sure that you

17    understood it, but if you answer a

18    question, I'll presume you understood it,

19    okay?

20         THE WITNESS:  Okay.

21         MR. YASHINSKY:  And, Chris, I don't

22    know if you want to stipulate reserving

23    objections.  I mean, obviously, it's a

24    discovery deposition, but --

25         MR. PERNICIARO:  Sure.

6

1          MR. YASHINSKY:  -- whatever you
2     want.  So we can --
3          MR. PERNICIARO:  Yeah.
4          MR. YASHINSKY:  -- reserve all --
5     reserve all objections, except to the
6     form of the question?
7          MR. PERNICIARO:  That's agreed.
8          MR. YASHINSKY:  Okay.
9          MR. PERNICIARO:  And I just want to
10    inform Dr. Silcox that this deposition is
11    being recorded.  I know that the
12    deposition Notice didn't indicate that it
13    was being recorded, but I could tell that
14    it's being video recorded right now, just
15    so you're aware.
16         MR. YASHINSKY:  Yeah.  And in case
17    there's any confusion, when we first set
18    the deposition up it was supposed to be
19    in person, but we were informed by
20    Defense Counsel that it had to be by
21    Zoom.
22         MR. PERNICIARO:  Yeah.
23         MR. YASHINSKY:  It might've been a
24    miss communication somehow, but because
25    of that I have indicated to them we were

7

1       going to videotape it just so we would
2       have a recording of it.  I'm assuming
3       there's no objection to that, since it's
4       a Zoom deposition.
5            MR. PERNICIARO:  I'll leave that up
6       to Dr. Silcox.  Do you have any issue
7       with that?
8            THE WITNESS:  Just the deposition
9       policy that we have, actually has a --
10      It's a actually a greater fee schedule
11      for video or video testimony versus
12      non-video testimony.
13           MR. PERNICIARO:  Okay.
14           MR. YASHINSKY:  Okay.  I mean, is --
15      Is it going to be a problem?  Like is
16      there an additional charge over the
17      $2800?
18           THE WITNESS:  It --  It probably
19      will.  I don't know what that amount is.
20      It's not exorbitant but it is higher than
21      the rate of a non-video deposition.
22           MR. PERNICIARO:  There is --
23           MR. YASHINSKY:  Well, what --  What
24      is the in-person deposition fee?
25           THE WITNESS:  Off the top of my

8

1     head, I don't know the numbers.  I can

2     get you our policy, that I guess your

3     office probably signed off on.

4          MR. YASHINSKY:  Well, and all I --

5          THE WITNESS:  Yeah.  That's a --

6     That's a --  It's how it would've

7     generated the $2800.

8          MR. YASHINSKY:  Okay, but then when

9     we were told it would be by video over

10    Zoom, it was the same amount.

11         THE WITNESS:  Oh --  Oh, was it?

12    Well, I have no idea.  I --  I don't --

13    My administrative assistant would know

14    the answer to that question, I do not.

15         MR. YASHINSKY:  All right.

16         MR. PERNICIARO:  It looks like the

17    rates are different, Jeff.  Based on the

18    rate sheet that I'm looking at that you

19    forwarded, I think as a an exhibit that

20    you were going to use today, the rates

21    are slightly higher for video recorded

22    depositions.  Like the first hour is

23    twelve-fifty instead of one thousand --

24    for the first hour.

25         MR. YASHINSKY:  Okay.  Well, the

1    problem is, we had asked to do this

2    in-person and then we were told by your

3    office, Chris, that it had to be by video

4    or by Zoom.  And, you know, I wasn't

5    advised as difference in charges based on

6    those changes because we had agreed to do

7    it by -- in-person.

8          MR. PERNICIARO:  Yeah.  I think a

9    Zoom -- a Zoom deposition doesn't have to

10   be video recorded though.

11         MR. YASHINSKY:  It --  It does --

12   It doesn't, but I wanted to do it

13   in-person.  I was told that I could not

14   and that's why I told them I wanted to

15   videotape it.

16         MR. PERNICIARO:  Yeah.  Well, I --

17   I --  I mean, his office is, you know,

18   policies are their policies.  I don't

19   know there's anything I can do about

20   that, so...

21         MR. YASHINSKY:  Doctor, are you

22   doing in-person depositions?

23         THE WITNESS:  As far as I know, yes.

24         MR. YASHINSKY:  Okay.  Well, Chris

25   can --

1          THE WITNESS:  Now --  Now I say

2     that, I don't know if from a corporate

3     standpoint whether Peachtree Orthopedic

4     Clinic has said they are not going to do

5     in-person depositions.  If --  If that is

6     a policy that I am not aware of, my

7     administrative assistant may be aware of

8     it, but I -- I'm not.  So that's why I

9     was sitting here thinking we were having

10     the deposition here at the office and I

11     was waiting for somebody to tell me you

12     were here, so...

13          MR. YASHINSKY:  Right.  And that was

14     the original plan when the deposition

15     Notice went out.

16          THE WITNESS:  Okay.  So it may be

17     because of the Delta variant, our office

18     made a policy change, I don't know.  I

19     would have to ask the CFO or not the CFO,

20     the COO, who would be the one who made

21     the call on that.

22          MR. YASHINSKY:  Okay.  All right.

23     Well, I'll --  If --  If --  If they're

24     going to send a bill, obviously, I want

25     to know that we're going to have to pay

1           extra, but I mean we'll bring that up.
2                 THE WITNESS:  If -- If -- If $2800
3           for a two-hour deposition sounds like you
4           may have gotten the video charge anyway.
5           So I --  I don't know what the number is.
6                 MR. YASHINSKY:  That was my
7           impression, but that's fine.  We can --
8           We can deal with that later.  We can
9           start the deposition.  Thank you.
10  Whereupon,
11                    HAL SILCOX, M.D.
12  was called as a witness herein and, having been first duly
13  sworn, was examined and deposed as follows:
14                  CROSS-EXAMINATION
15  BY MR. YASHINSKY:
16      Q.   Doctor, can you state your full name and
17  occupation, for the record?
18      A.   Daniel Hal Silcox, III.  I'm an orthopedic spine
19  surgeon.
20      Q.   And where do you currently work?
21      A.   Peachtree Orthopedics.
22      Q.   How long have you been there?
23      A.   I've been here almost 21 years.
24      Q.   Where was the practice you worked at or what
25  practice did you work at before Peachtree Ortho?

12

1      A.    The Emory Clinic.

2      Q.    And how long were you there for?

3      A.    I was there for nine years.

4      Q.    And before that where did you work?

5      A.    Before that I was in my residency fellowship and

6   all with Emory University.  So I was --  I did my

7   undergraduate degree at Emory, graduated in 1983 then did my

8   medical education at Emory and graduated in 1987 and then did

9   my residency and fellowship through the Emory University

10  affiliated hospitals, started actually with Emory, actually

11  in 1992.  So hopefully that helps you understand my

12  employment record.

13     Q.    Yeah.  And --  And what was the fellowship in?

14     A.    Spine surgery.

15     Q.    Okay.  Are you a Board certified surgeon?

16     A.    I am.

17     Q.    Do you have any certifications other than your

18  Board certification surgery?

19     A.    No.

20     Q.    And you're licensed to practice in Georgia?

21     A.    I am.

22     Q.    You licensed to practice in any other states?

23     A.    No.

24     Q.    I'm sorry.  I didn't --

25     A.    No.  No.

1      Q.   Got you.  And do you have any special experience or
2  training in the field of biomechanics?
3      A.   Well, other than what is included in our residency
4  and fellowship -- You have to understand biomechanics to
5  pass your Boards, but I do not have a degree in biomechanical
6  engineering.
7      Q.   Okay.  And have you ever received any degrees or --
8  or certifications in human factors?
9      A.   In what?
10      Q.   In human factors?
11      A.   Human vactors (ph)?
12      Q.   Factors, f-a-c-t-o-r-s.
13      A.   I don't even know what human factors are, so I'm
14  not certain.
15      Q.   Okay.  Any other specialized experience or training
16  that you use in the course of your job as a surgeon?
17      A.   I don't think so.
18      Q.   And what type of surgeries do you specialize in?
19      A.   All types of spinal surgery from the base of the
20  skull, including the base of the skull down to the coccyx,
21  and everything in between.
22      Q.   Is there anything in particular that you -- that is
23  -- takes up the majority of your surgical work?
24      A.   I mean, I -- I --  I certainly do probably if I
25  think about it.  Probably --  I'm going to say, probably 60

14

1   percent of my practice is lumbar and probably 35 percent is

2   cervical and then the other 5 percent would be thoracic, but

3   those are rough numbers, it -- it could be different than

4   that.

5        Q.   And how many surgeries do you typically perform a

6   year?

7        A.   Probably 250 to 300.  That may have been down in

8   the last year because of COVID.

9        Q.   Okay.  And when you perform lumbar surgeries, is it

10  a -- a full range of lumbar procedures or is there something

11  in particular that you specialize in?

12       A.   No.  I do all forms of -- of lumbar spine surgery.

13       Q.   Okay.  And as far as non-invasive surgical

14  procedures, like radial frequency ablations, things of that

15  nature, do you also perform those types of procedures?

16       A.    I do not.  So I have partners at Peachtree

17  Orthopedic Clinic who do those on a regular basis.  So I -- I

18  --  I would get Dr. Schiff or Dr. Pollydore or Dr. Langenbeck

19  or Dr. Chang, they're all physiatrists, they would do those

20  procedures for us.

21       Q.   All right.  Would you consider those types of

22  procedures pain management?

23       A.   Essentially, yes.

24       Q.   And do you share patients with the other doctors in

25  your practice, I mean, if they need something that -- like an

1  ablation, you would refer them to a -- a different doctor in
2  the practice?
3      A.   Yes.
4      Q.   And would they refer patients to you that might
5  need a fusion?
6      A.   Correct.
7      Q.   All right.  Have you ever referred patients to a
8  different doctor to have a lumbar surgery, such as a fusion
9  or -- or something more invasive than a pain management
10 procedure?
11     A.   No.
12     Q.   And have you ever referred patients to a
13 neurosurgeon, either with your practice or with a different
14 practice?
15     A.    Not unless they have some, what we call a
16 intradural tumor.  So if there were a tumor of the spinal
17 cord that was actually inside of the dura, I would refer them
18 on to a neurosurgeon, but otherwise I -- I would do my own
19 spine surgeries.
20     Q.    Have you ever referred any patients to
21 Dr. Elshihabi?
22     A.   No.
23     Q.    And do you know if you've ever referred patients to
24 Dr. Mortazavi?  I know he's not with Peachtree Orthopedics,
25 but --

1          A.    No.

2          Q.    I'm going to ask you about your report in a few

3    minutes, but a little bit more background.  Can you tell me,

4    what percent of your practice is dedicated to reviewing

5    matters that don't involve your actual patients or treating

6    patients?

7          A.    That would be less than five percent.

8          Q.    And do you primarily do that work for the defense

9    versus the plaintiff?

10         A.    I do not specify who I will review records for.  So

11   if they'll provide me records, I really --  I don't care

12   whether it's the defense or the plaintiff, but I will say --

13   I will say that probably the majority of the requests I get

14   are from defense and less from the plaintiff.

15         Q.    Okay, thank you.  And do you have a typical charge

16   for a case that a defense lawyer presents to you -- the

17   records for review?

18         A.    A $3500 retainer fee, which includes review of the

19   records and usually a phone conversation after the -- the

20   review of the records.

21         Q.    And after the $3500 is exhausted, do you charge on

22   an hourly basis?

23         A.    I --  I do if there are a lot of requests.  If it's

24   just a, you know, a simple five minute phone call, I probably

25   won't charge for that.  I --  I'm not an attorney, so I don't

17

1  charge by the hour in that sense, but if -- if it were --

2  Like I actually did get some extra records from one of the

3  attorneys just yesterday and -- and so, I will assemble a

4  little charge for that because it's -- it's not a lot, but it

5  -- it did take time to go through these additional records.

6      Q.   Okay.  So is the $3500, is that -- that includes a

7  review and a phone consultation?

8      A.   Correct.

9      Q.   And then, if you do a written report, is there an

10 additional charge?

11     A.   There could be.  I think I did in this case because

12 it was a --  There were a lot of records, so the --  So I

13 don't know exactly all the charges I had for this, but my

14 administrative assistant will supply those to you if -- if

15 you require them.

16     Q.   Yeah.  And they were requested in the Notice for

17 the deposition, your -- your billing information for this

18 file.  We have not received it.  Do you know what your total

19 bill, other than this deposition, has come to in this case?

20     A.   I do not.

21     Q.   But that is something you could find out and

22 provide to your Attorney -- to the Attorneys, who can give it

23 us?

24     A.   Yes.

25     Q.   But typically, the written report is not -- does

18

1  not cost anything in addition to the retainer amount?

2      A.   It -- If it's -- If it's not a long report.  Like

3  I said, this one could be a little different, only because I

4  received two large boxes of records.  It was a lot of record

5  review not --  A lot of records I get, you know, it's -- it's

6  maybe whatever, about this much (indicating), but these were

7  big boxes.  So it was --  It was a lot of records to go

8  through.

9      Q.   And do you have an hourly rate for your record

10 review or for your involvement in the case?

11     A.   It should be on that -- and I think you were

12 supplied with my fee schedule, so it should be on there.  I,

13 quite frankly, I don't remember what it is right now.

14     Q.   Okay.  When you --  When you're paid on the record

15 review matter or getting involved in a case, do you receive

16 the income that comes from that or does that go to Peachtree

17 Orthopedics?

18     A.   It comes through Peachtree Orthopedics, but then it

19 is -- it is not, what would I say, it's -- it's not --  It

20 doesn't hit the overhead the same way that seeing patients in

21 the office would be.  So there's a less of the -- a draw from

22 that amount of money, if that makes sense.

23     Q.   Well, and --

24     A.   So --  So, in other words, if I'm seeing patients

25 in a clinic, then the overhead is --  And this would be for

19

1    all doctors in the clinic, if you're seeing patients in the
2    office where you're doing surgery and it's considered
3    clinical, it's subject to the overhead -- the general
4    overhead.  And then each doctor has their own smaller
5    overhead based on how many employees they directly employ and
6    -- and then that's where this would be a factor.
7        Q.   Okay.  So part of the money would go towards paying
8    your overhead.  Specifically, for the work you're doing, but
9    not necessarily for all of the practice?
10        A.   Correct.
11        Q.   Okay.  Do you know the -- the percentage or the
12    breakdown for what you receive in a -- a case like this as
13    opposed to a patient?
14        A.   We call this outside services and I think last
15    year, probably be guessing, I don't know the exact number,
16    but maybe it was a hundred and twenty-five thousand -- a
17    hundred and thirty thousand of collections over the twelve
18    months of 2020.  And that --  Anyway, so that's the -- the
19    number.
20        Q.   Okay.  So just using that year as an example, you
21    earned $125,000 doing reviews, which you -- a portion of that
22    goes to paying your overhead, but the rest of that would be
23    income that you earn?
24        A.   Correct.
25        Q.   Okay.  And is that about average, a hundred and

20

1  twenty-five thousand a year?

2      A.   I mean, it varies from year to year.  I mean, I --

3  I know at times, maybe it's --  It's been maybe, you know,

4  almost 30 years of practice, probably in the first few years

5  I was in practice, it was less than five thousand a year.

6  And then as my reputation in town, just from practicing went

7  up, then that changed also.  And you need to also understand

8  that number includes depositions for patients who have a

9  work-related injury.  So I may have actually taken care of

10 those patients. And they also include depositions where I

11 took care of a patient and they had a slip and fall or a

12 whatever, kind of like Mr. Harvey did.  So those are still --

13 even though I have an active patient, it's -- that still goes

14 to the outside services.  So it's not like that money is

15 generated from my review of records, as an independent

16 reviewer.

17     Q.   Have you ever testified for the -- the Defense

18 Counsel's -- at the Defense Counsel's request in a case where

19 you actually treated the patient who was involved in the

20 claim or the lawsuit?

21     A.   Did I ever --  I want to make sure I understood

22 that question.

23     Q.   Yeah.  If --  If --  Have you ever testified for

24 Defense Counsel in a case, where you actually treated the

25 patient involved?

21

1      A.   No.  No.  So probably in that case, I would've been

2   --  If it was a patient that fell, probably I'm being asked

3   to -- as a fact witness, I guess that's what you guys call

4   it.  It's usually I'm asked by the plaintiff's attorney and

5   they -- they name me as a witness for the plaintiff.

6      Q.   Okay.  And you --

7      A.   Presumably --

8      Q.   Sure.

9      A.   I assume.  I don't ever remember a defense attorney

10  asking me to testify with regards to the individual that got

11  hurt and they're the plaintiff, that just doesn't usually

12  happen.

13     Q.   Okay.  But like in a situation where maybe that you

14  treated them before their accident, then they ended up

15  treating with someone else after their accident, you don't

16  recall any situations where Defense Counsel hired you to

17  testify about the treatment you provided to the patient

18  before their injury?

19     A.   I do not remember ever being asked to testify in

20  that circumstance.

21     Q.   Okay.  Have you ever worked for Gray, Rust, St.

22  Amand, Moffett & Brieske before?

23     A.   I believe I have reviewed cases for them in the

24  past.

25     Q.   And have you testified in those cases?

22

1      A.   I --  I would've done a video -- or a video, a
2   deposition testimony, but I --  As far as I know, I've never
3   been to court for any of the cases that I may have reviewed
4   for them.
5      Q.   Okay.  Do you know if your testimony has ever been
6   stricken as a result of a Daubert challenge in any case?
7      A.   I don't know what that is.
8      Q.   If anybody --  Do you know if anyone has ever
9   challenged your ability to testify on the grounds that you
10  weren't qualified to offer the opinions and so it was
11  stricken from a case?
12     A.   I'm not aware of that.
13     Q.   Okay.  And you don't know of any situations where
14  your testimony was limited because it was deemed unqualified
15  for the particular case, even if it was just a portion of
16  your testimony?
17     A.   Not to my knowledge.
18     Q.   Okay.  Do you have a rough idea how many times you
19  have testified for the Defense in the last five years?
20     A.   Not off the top of my head.  I mean that would be
21  very hard for me to answer.  I --  I just don't remember.
22     Q.   Okay.  When was the last deposition you gave?
23     A.   I gave one last week.
24     Q.   And do you know what -- which attorney hired you
25  for that case?

23

1      A.   One second, I'll tell you.  (Witness retrieves

2  documents.)  Paul Weathington, it was a --  Huh, somehow I

3  just got wet.  I'm not sure how I got --  I apologize for

4  that.  I'm not certain where wet would've come from.

5      Q.   Well, you didn't get any of us wet, so we're okay.

6      A.   I just realized I had a water bottle in my pocket

7  and it was open.  That's really nice.

8      Q.   That would have been --  That would have been an

9  interesting mystery.

10      A.   I was going, I -- I'm incontinent and I'm cold,

11  that's really -- really strange.  Anyway, but, so Paul

12  Weathington had me as an expert in a medical malpractice

13  suit.

14      Q.   And that was actually my next question is, do you

15  testify in medical malpractice and other personal injury

16  cases?

17      A.   Yes.

18      Q.   Okay.  And before last week, when was the last

19  deposition you gave?

20      A.   I --  I cannot tell you.  I would --  I would

21  assume I had one a few months before, I --  I would have to

22  get my administrative assistant to look at my calendar and --

23  or I could look at it and try to remember, but I don't

24  remember one off the top of my head as to when it was last

25  done, before last.

24

1      Q.   Okay.  Do you have any general ideal how many you
2  do -- how many depositions you do in a year?
3      A.   You --  You know, I would say probably I average
4  one a month.  And, again, a lot of times those --  I would
5  say most times, those are for work-related injuries, but
6  sometimes they're not.
7      Q.   Okay.  Has --  Has the firm that has hired you in
8  this case, and I had said it was Gray, Rust, have they ever
9  hired you to do an IME of an opposing party?
10      A.   They could have, but I -- I -- I don't -- you know,
11  off the top of my head, I do a lot of IMEs.  So I, quite
12  frankly, I don't pay attention to who they come from.  I try
13  to do them as a -- a unbiased independent third-party.  So I
14  don't really pay attention to who sends them over, but they
15  could've sent one.  I --  I don't know.
16      Q.   Were you ever asked to do an IME of Mr. Harvey?
17      A.   I don't recall doing one for him.
18      Q.   Well, and I --  I think it's --  I think it's safe
19  to say that you haven't done one, but do you know if you were
20  ever asked about doing one in this case?
21      A.   I do not recall being asked to.  No.
22      Q.   Okay.  And do the cases you typically testify in,
23  where you're hired by the Defense, most often involve
24  surgeries that have taken place?
25      A.   Well, yeah, it's -- it's --  Well, that's --

25

1    That's really asking me too much to remember.  I --  I --
2    Some of them have had surgery before, some have not had
3    surgery before.  Some were, you know, recommended surgery and
4    surgery never took place.  So I mean anything could've --
5    could be the case.  There's not like a pattern of -- of how
6    these cases come to me.
7            Q.    Okay.  So they're not all surgical cases?
8            A.    Correct.
9            Q.    Or they're not all --  Surgeries hadn't happened in
10   all the cases that you're testifying in?
11           A.    Correct.
12           Q.    Got you.  Okay.  Have you ever told a -- a defense
13   lawyer that it would be better for you to be able to review
14   cases before surgery is performed?
15           A.    I don't ever recall saying that but I -- I --
16   There's just no way I could.  I don't recall ever having that
17   come up before, but it could have.
18           Q.    Okay.  But as a standard practice it -- it doesn't
19   matter to you when they ask you to review a case, whether
20   surgery was done or not.  You're -- you're not necessarily --
21   It doesn't matter for your purposes, as far as evaluating?
22           A.    Correct.
23           Q.    Okay.  Do you know how much time you have spent on
24   this specific matter?
25           A.    I'm going to assume ten hours.  And again, I don't

26

1    have a sheet in front of me for my administrative assistant

2    to spell out anything differently, but it took a while to

3    review the initial records and that was last year.  And then

4    I think they asked for a report later, and I had to go back

5    and look at the records some when I was writing the report.

6        Q.   Okay.  Do you -- Does your bill reflect when

7    you've put time in on a particular file?

8        A.   So, yeah.  Most of these files fall under that

9    $3500.  So I -- I usually -- I started doing that years

10   ago, because I'm not very good at writing the times I would

11   review it and I would get distracted by somebody asking me

12   another question, and then I'd come back.  And I -- I found

13   -- I really -- Unlike you guys, where y'all can -- y'all do

14   it, what, by the -- every six minutes, I think, is the way

15   lawyers work on the defense side.  I know if you're on the

16   plaintiff's side it's -- it's contingency, I guess, but,

17   nonetheless, I -- I don't do that and I get interrupted and

18   then I get lost and I can't keep up with my time.  I -- I'm

19   just not very good at that.  So I just said, you know what,

20   we'll come up with a flat fee and that usually will encompass

21   everything I need.

22                   MR. PERNICIARO:  Jeff, can I

23              interrupt for a second?  Do you want to

24              go off the record and me send you the

25              invoices that we have in the file, so we

27

1              can figure that out, if you don't have

2              them?

3                  MR YASHINSKY:  If you can send them

4              to me, you know, I don't think that we

5              need to break for it, but, you know, I

6              may want to take a quick look at it

7              before we finish.

8                  MR. PERNICIARO:  Okay.  Maybe when

9              we take --  Maybe we can take a break,

10             when you're at a stopping point and then

11             we can do that at some point.

12                 MR. YASHINSKY:  Okay.  Yeah.  If you

13             guys have them, I'd like --  I'd like to

14             have them, in case I have any follow-up

15             questions, but I don't want to take up

16             more of the doctor's time than I need to.

17                 MR. PERNICIARO:  Right.

18                 MR. YASHINSKY:  Okay.

19   BY MR. YASHINSKY:  (Resuming)

20        Q.   And you -- Doctor, you said ten hours as an

21   estimate on this case just based on the volume.  I assume

22   that means you don't normally spend ten hours on a review in

23   a case for a defense lawyer in a personal injury suit?

24        A.   Yeah.  Usually what I see that will come by is

25   usually to review the actual records and all the films.  It's

28

1   usually like four or five hours.  And, you know, so I --  I,
2   again, you know, my --  My fee schedule may ask -- say more
3   per hour for record reviews, but again, most people don't ask
4   me to just do an hourly record review.  They --  They usually
5   do a, you know, this fee that I told you before of thirty-
6   five hundred.
7        Q.   Okay.  In this case, do you know if after --  Well,
8   let me ask you this, did they reach out to you and ask you to
9   take a look at this case and then you say, sure, send the
10  records?
11       A.   I --  I couldn't --  I --  I'm certain that in
12  order for them to send me the records, they would've called,
13  but they probably would not have talked to me, probably
14  would've talked to my administrative assistant.  They
15  could've sent an email.  I'm not certain what they may have
16  sent.  I know I certainly have a -- a letter from when they
17  sent the records over initially, but I'm sure they would've
18  contacted me before then, but I probably was not in the
19  middle of that, other than for my administrative assistant to
20  say, do you have time to look -- review records, which is
21  kind of funny, because usually I'll say yes or no, based on
22  how busy I feel at the time, and then usually it shows up
23  later and I wish I hadn't said yes or I wish I'd of said no,
24  I -- I don't --
25       Q.   Right.  Well, and that was one thing I was

29

1   wondering about is when you were first contacted by Defense
2   Counsel in this case.
3       A.   (Witness retrieves documents.)  So I found the
4   letter that came with the records.  And that's dated 5 --
5   5/12/2020, and it's from Jessica Wilds, a paralegal.  And it
6   says -- first sentence says, as you are aware our office
7   represents Defendant Kroger in the above referenced case.
8   And so --  And it says, we appreciate your willingness to
9   review the case on behalf of our client and enclosed are the
10  documents, and it lists all the documents.  It says, if you
11  have any questions or comments, do not hesitate to contact
12  us.  And that -- that's pretty much it.  So they --  They
13  obviously --  They contacted me to see if I would review the
14  records and then they sent this.
15      Q.   Okay.  And do you know, did they contact you or
16  they contacted someone with your office and they said, yeah,
17  go ahead and send them?
18      A.   I'm sure they would've contacted Sean (ph) Perry,
19  who is my administrative assistant.
20      Q.   Okay.  And you --  I'm sorry, you said that was May
21  12th of 2020?
22      A.   Yes, May 12th, 2020.
23      Q.   Okay.  And so since I don't have the copy of that
24  letter yet, can you tell me what they included with that, as
25  far as records?

30

1          A.    I -- I can read off this letter.  It says, instant

2    report, images, video clip of incident, deposition transcript

3    of Thomas Harvey court, chiropractic, Atlanta ambulance,

4    WellStar Paulding Hospital, Spilker Family Medicine, WellStar

5    Medical Group Neurology, WellStar Paulding Hospital films,

6    WellStar Paulding Hospital, WellStar Paulding Imaging, Back

7    In Line Chiropractic, Resurgens Orthopedics films, Resurgens

8    centralized films, Resurgens Orthopedics, WellStar Cobb

9    Hospital films, WellStar Cobb Hospital Pain Solutions

10   Treatment Centers.  And then there's another page that goes

11   order -- order for records.  I'm not certain what that means.

12   Maybe that's the order they had the records in the -- in

13   their five binders.  So I think you can kind of, you know,

14   since this is the binders that came (indicating), they're

15   probably, I don't know, five or six inches thick.

16         Q.    Okay.

17         A.    There are five of those.

18         Q.    And then they've sent you additional records

19   recently, correct?

20         A.    Yes.

21         Q.    And did they send you any others in between those

22   two periods of time, the ones you've just received and the

23   ones you first got?

24         A.    I don't recall getting any other records.

25         Q.    And do you usually request any kind of video of the

1  -- the fall or an accident, if that's part of the review?

2      A.   I don't ask for it, that -- it --  It shows up with

3  the records if --  So I --  I'm -- I mean it's kind of hard

4  for me to ask for something I don't know whether it exists.

5  Obviously, they sent me one so I reviewed it.

6      Q.   Okay.  And incident reports, is that something you

7  normally request to see?

8      A.   Again, I take what they send me.  I don't request

9  more because I'm not certain what I would be requesting.  I

10 -- I am totally assuming that the records are complete with

11 regards to the care of the injured individual.

12     Q.   Okay.  And what specifically did they ask you to do

13 in addition to reviewing the records?

14     A.   They just ask me to review the records and then

15 have a phone conference.

16     Q.   Okay.  And so, is that what happened in this case?

17     A.   Yes.

18     Q.   And do you know when that phone conference took

19 place?

20     A.   Not off the top of my head.  That's again, that

21 probably would be in the invoices, perhaps that their group

22 has.  Maybe Chris has them and can send them over to you.

23 I'm not certain what the date was.

24              MR. PERNICIARO:  Jeff, I just sent

25         you an email.  It's got the two invoices

32

1        that I located for this.  And there is

2        also a check, but there's no invoice for

3        it, so I mention it in the email.

4            MR. YASHINSKY:  Thank you.  I

5        appreciate that.

6            MR. PERNICIARO:  I --  I don't know

7        if it helps.

8            MR. YASHINSKY:  I appreciate that.

9            MR. PERNICIARO:  Okay.

10   BY MR. YASHINSKY:  (Resuming)

11      Q.   And do you know which attorney you were dealing

12   with or who you may have spoken with that in that phone

13   consultation?

14      A.   Oh, one second.  (Witness retrieves documents.)

15   Sarah, I think Lisle, I --  I don't know how to say her last

16   name, but it's spelled L-i-s-l-e.

17      Q.   Okay.  Sarah Lisle.

18      A.   Lisle, okay.

19      Q.   But that's --

20      A.   Sorry, I --  I can't -- I'm not very good with

21   words.

22      Q.   I understand, but that would be the Attorney you've

23   talked to about this case?

24      A.   Correct.

25      Q.   And when you spoke with her on the phone, before

33

1    you did a written report, did you give her your opinions?

2        A.    I'm sure I did.

3        Q.    And do you know if she asked you to do anything

4    further at that point?

5        A.    I can't recall.

6        Q.    Okay.  Well, were you asked, at some point, to do a

7    written report?

8        A.    I was.

9        Q.    Okay.  And --

10       A.    So, yes.  Yeah.  So yes, hat's correct.  At some

11   point they said, please give us a written report.

12       Q.    And do you know when that was?

13       A.    Not off the top of my head.

14       Q.    Okay.  And is she the only Attorney that you've

15   spoken do about this case?

16       A.    I believe so.  And I --  So we spoke yesterday and

17   Ms. Lisle told me she was not going to be -- that was a

18   little bit of the conversation was, she was not going to be a

19   part of the deposition.  And so, I --  I spoke with her

20   before then and our conversation yesterday was very short,

21   but we spoke months ago, but I don't recall when that was.

22       Q.    Okay.  When you spoke with her, did she talk about

23   what today's deposition was going to be involving or any

24   specific issues that were going to come up?

25       A.    No.  I think I -- I --  I gathered that the main

34

1   reason she wanted to have a conversation was because of these

2   additional records.  And she said, would it change my

3   opinions.  And I go, well, I haven't seen the records, so I

4   don't know whether it will change my opinions or not.

5          Q.    Okay.

6          A.    So anyway, so I received the records.  They came

7   yesterday late and then I reviewed them a little while ago.

8          Q.    All right.  And did they change any of your

9   opinions?

10         A.    No.

11         Q.    All right.  Now I move on to some of the specifics

12  of your review and then we'll talk about your report.  Just

13  so I'm clear, you've never met or examined Mr. Harvey,

14  correct?

15         A.    Correct.

16         Q.    And you've never spoken with him, at any point?

17         A.    Correct.

18         Q.    You have not spoken to any of his medical

19  providers?

20         A.    Not about him, correct.

21         Q.    Okay.  But you may have spoken with them about

22  other things, you may know who they are, is that --

23         A.    Yeah.  Dr. Mortazavi came over and learned how to

24  do a specific type of surgery, as a visiting surgeon, in our

25  outpatient surgery center in the last couple of years.  I

35

1   can't remember where -- when it was.

2         Q.    And you were --

3         A.    I think I may of --  I may of also --  He may have

4   been on a -- another educational program, where I'm -- he was

5   -- he was there to learn and I was on the faculty.

6         Q.    Okay.  Do you know if those may have taken place

7   before he treated Mr. Harvey?

8         A.    I -- I -- I would not recall.

9         Q.    Okay, but you've never talked to anybody or      Dr.

10  Mortazavi about this patient --

11        A.    No.

12        Q.    -- is what I gather?  Okay.

13        A.    No.

14        Q.    And other than Kroger's Attorneys, you haven't

15  spoken to anybody else about this particular case?

16        A.    No.

17        Q.    Have you ever testified or written a report in a

18  case involving Kroger as a defendant?

19        A.    Well, I'm sure I have.  I --  I just can't tell you

20  when or what the circumstance was.  And --  And I should also

21  say that I may be --  I may be, I don't know for certain, I

22  may be on the panel for Kroger for work-related injuries.

23  I'm not certain of that, but I could be.

24        Q.    And that means that you're one of the doctors that

25  are approved if they have a workers' comp issue for a patient

36

1  to go see for treatment?

2      A.   Correct.  And that would be unsolicited by me.

3  Usually my name is on the panel vis-a-vis, the attorneys for

4  that company.  And so again, I --  I don't know if I am or

5  not, you know, and I'm sure --  I'm sure they do it by

6  location.  So if your, you know, Kroger in Savannah, Georgia,

7  I'm not on your panel, but if --  If it's in Sandy Springs,

8  Atlanta, Georgia region, then I could be.  I --  I don't know

9  though.

10     Q.   Okay, but do --  Do you know if you were testifying

11 in cases in which Kroger was the Defendant and who -- whose

12 attorneys hired you in the past 12 months?

13     A.   Not off the top of my head.  I couldn't --  I can't

14 recall.

15     Q.   Do you have a list of -- of cases that you've

16 testified in?

17     A.   Not an active one.  And this is --  I don't know,

18 is this in Federal Court?

19     Q.   It is.

20     A.   Oh, great.  So if you ask for them, we don't really

21 have them and it's a pain because I --  I don't know how

22 that's been resolved in the past.  If --  If y'all need the

23 list, then I have to get my administrative assistant to try

24 to go back and piece together all the different times I've

25 been deposed.  So it could be done, but it's -- it's not --

37

1   we don't keep a running list.

2        Q.   Okay.  Is it safe to say that you've done reports

3   in cases where you have not testified that involved Kroger as

4   the party that hired you?

5        A.   I -- I -- I'm sure it could've occurred, but I --

6   I don't -- Again, I don't know off the top of my head.

7        Q.   And do you know if, when you've testified in cases

8   involving Kroger, not in a workers' comp, but in a personal

9   injury setting, has it always been through the same firm that

10  hired you in this case?

11       A.   I cannot say for certain on that.  I -- I've been

12  -- I've been practicing 30 years almost so --

13       Q.   Right.

14       A.   I don't know whether they represented or -- or

15  whether they were a firm 30 years ago, so I don't know.

16       Q.   I got you, okay.  At any point prior to you

17  offering your initial opinions about the records, did anybody

18  from Kroger's Counsel's office tell you what they were --

19  what the issue was in this case?

20       A.   No.

21       Q.   Now -- And I've got as Exhibit 3 to -- Well, let

22  me -- I'm just going to add Plaintiff's Exhibit 1 as the

23  Deposition Notice and Notice to Produce to Dr. Silcox.

24  Exhibit Number 2 is the fee schedule that was produced by

25  Defense Counsel.  And then Exhibit 3 is your report dated

38

1  July 11th of 2021.

2                 (Whereupon, Mr. Yashinsky marked

3                 Plaintiff's Exhibit Number 1, Number 2,

4                 and Number 3 for identification.)

5  BY MR. YASHINSKY:  (Resuming)

6     Q.   Do you have those documents, Doctor?

7     A.   (Witness reviews Plaintiff's Exhibit Number 3.)  I

8  only have my report from July 11th, 2021.

9     Q.   Okay.  Well, that's what we're going to talk about

10 now so it shouldn't be a problem.  I --  I'd like to start

11 off asking you -- the first sentence you state, I am writing

12 as follow up to the review of the Thomas Harvey vs. Kroger

13 lawsuit medical records; is that --  Is that the report we're

14 talking about?

15    A.   Yes.

16    Q.   Okay.  When you say as a follow up, what do you

17 mean by that?

18    A.   So I reviewed the records and I'm now producing a

19 letter.  I guess the follow up could of been also in

20 reference to the fact that I had talked to Ms. Lisle --

21    Q.   Lisle.

22    A.   -- about this case.  And then, I guess they had

23 called back and said we would like a report.  And I went --

24    Q.   Okay.

25    A.   -- okay, I'll -- I'll write -- write the report.

Q. Okay. So it's not a follow up to a previous report or a prior report that you did in this case?
A. No.
Q. And this is the only report that you have produced to them?
A. Correct.
Q. Did you provide it to them in draft before you finalized it?
A. No.
Q. And did you ever ask for their input in the -- doing the report?
A. No.
Q. Did they ask you to make any changes or revisions to it, at any point?
A. No.
Q. All right. Going on to the next -- and I'm not going to ask you about every sentence, but you said, in forming your opinions regarding this case, you've reviewed the incident report, images of the banana on the floor, as well as video clip of the incident. Can you tell me, what is the benefit of looking at the incident report in a review of someone's medical records like this?
A. Well, I, obviously, it's -- it's what is-- And I'm not looking at the report, so I can't remember exactly how it looked, but typically those are documented by the supervisor

40

1  of whatever for the individual that the store -- whatever,

2  where somebody gets injured or it would be an incident report

3  if the police were at the scene of a motor vehicle accident.

4  It's basically the report of the facts.  And again, I, you

5  know, it's from the standpoint of somebody who's supposed to

6  be unbiased and just reports what's going on --

7      Q.   Okay.

8      A.   -- what happened.

9      Q.   And how does that help you reviewing the records

10  for the medical treatment?

11     A.   With regards to the medical treatment, I mean

12  obviously, it kind of helps me understand what happened to

13  the individual, you know.  It --  It does give me some clues

14  as to the level of energy that's involved with the fall or

15  the motor vehicle accident or, you know, if somebody fell off

16  a ladder or something like that, I have a -- a general

17  understanding of how much energy was imparted at that time.

18     Q.   Let me ask you, when you say a general

19  understanding, you don't have any specific background or

20  education in the field of biomechanics?

21     A.   I believe you asked me that before --

22     Q.   Right.

23     A.   -- and the answer is no.  I do not have a degree.

24     Q.   So your general understanding.  Is it based on some

25  type of scientific element?

41

1       A.   Well, it's from a -- again, from Board

2   certification, when you go through the process you have to

3   study biomechanics as you go through your residency, that's

4   part of the core curriculum.  So you understand exactly the -

5   - the -- the vectors of force and how people fall and how

6   that creates a fracture of the hip or a fracture of the femur

7   or a fracture of the pelvis or something like that.  So it

8   gives you understanding of how those injuries occur.  Now, as

9   to how much force and actual speed at which they hit the

10  ground, there are assumptions, I'm sure that a biomechanical

11  engineer takes into account when helping you guys as

12  attorneys.  I -- I --  I do not do that.

13      Q.   Right.  And --  And scientifically speaking, can

14  you tell us the amount of force that was involved in

15  Mr. Harvey's fall in this case?

16      A.   Not a specific number that would be, again,

17  something that I think you would -- you would get from a

18  biomechanical engineer, but it's a ground level fall.  So

19  given his weight as being minus, I think it was around 30 to

20  32, yeah, that kind of gives you a sense of how much force is

21  hitting the ground, but, I mean, versus --  Basically, I'm

22  biased by patients who have a fall from a ladder, you know,

23  that's -- or off the roof of a house versus a ground level

24  fall.  So I do have a bias, and my understanding is, is

25  there's less energy imparted, but the specific number, I

42

1    don't know.

2        Q.    So you can't qualify or quantify the amount of

3    force in this particular fall?

4        A.    No.  And --  And --  And I'm sure, you know, that's

5    where biomechanical engineer will be able to use some

6    assumptions that would help to give a range for you guys of

7    the force involved, although they can't give you a specific.

8        Q.    Okay.  But you're not -- you're not qualified to

9    offer that?

10       A.    No.

11       Q.    Okay.  And then, the images of the banana on the

12   floor, what was the benefit of having that for your report?

13       A.    Zero.  Zero, basically.  It's a banana on the -- a

14   banana peel on the floor and I couldn't really distinguish

15   much more, other than it's a banana peel on -- with a dark

16   background, which I presume was the floor.

17       Q.    Okay.  And you don't know anything about the

18   material that made up the floor, I presume, what --

19       A.    No.

20       Q.    -- what it was?  Okay.  And the video clip of the

21   incident, what benefit did that provide you as far as

22   offering opinions in this case?

23       A.    I think it just validates the fact that he had a

24   fall.  It doesn't give me much more than that, because I

25   can't really --  I don't really see him step on the banana.

43

1  I just see him fall.  You see, it's kind of the bottom

2  left-hand corner of the video that I was provided.  So it

3  just documents, yes, he did, in fact, have a fall.

4        Q.   Okay.  And in fact --

5        A.   And it showed --  I think it showed somebody help

6  him to stand up, although it's --  It's difficult to see

7  exactly how he went about doing it.

8        Q.   Okay.  And in the video, would you agree with me

9  that you only see his feet going up in the air, you don't see

10  his whole body and part of his body landed on the ground?

11        A.   As I recall, that's correct.

12        Q.   Okay.  And as you said, you can't tell how long he

13  was actually on the ground before he gets up?

14        A.   Yeah.  I don't really recall that --  I'm sure the

15  video has a little timer on it, but I --  I can't tell you

16  off the top of my head.

17        Q.   Do you recall seeing any part of a video where he's

18  actually standing there after the fall?

19        A.   I --  I can't see the whole person.  So it's -- it

20  --  It looks like he gets up, but I can't tell much more.

21  It's a very two-dimensional picture.

22        Q.   Okay.  Is it possible that he was -- he was sitting

23  up after the fall but didn't actually stand up?

24        A.   It's certainly possible.  Like I said, there's not

25  enough detail to answer the question.

44

1        Q.   All right.  And is it --  Do you know if you watch
2    enough of the video to see how long it took until a manager
3    came to his aid?
4        A.   Again, kind of like the other question about time,
5    I don't recall.
6        Q.   Okay.  Do you know if he was bleeding anywhere as a
7    result of the fall?
8        A.   Not profusely, I know -- but if --  If you had an
9    abrasion, it seems like he --  I can't recall.  I wasn't too
10   in tune to an abrasion, but if he had one, that could of been
11   possible.
12       Q.   Okay.  Do you recall reading any records or
13   reviewing anything that indicated he was -- he was bleeding
14   on his head from the fall?
15       A.   I kind of think I remember that but, you know, that
16   was not something that really struck me as real significant,
17   because I was looking more for something that would, you
18   know, obviously that was ruled out.  He didn't have a
19   fracture of any particular bones.  I was just trying to
20   understand how he hit the ground, which, again, the video
21   isn't real -- it -- it isn't helpful in that manner.
22       Q.   Okay.  And if he was bleeding --  If his head was
23   bleeding after the fall, would you want to know what caused
24   that part of his injuries?
25       A.   My understanding --  You know my expertise is in

45

1   spine, so I really wasn't so much paying attention to whether
2   he had a laceration somewhere.  If he had a scalp laceration
3   that could come from hitting the floor or hitting one of the
4   racks or whatever in the -- the grocery store.
5       Q.   Okay.  And along those lines, and I'm now looking
6   at the third paragraph, the second sentence states,
7   furthermore, the incident report documents said he had a
8   bruised hip that was greatly due to a concealed weapon.  The
9   police department was dispatched in order to sort through
10  this issue.  Does that have any relevance to your opinions in
11  this case?
12      A.   No.
13      Q.   Okay.  Any particular reason you included that in
14  your report?
15      A.   Well, that could be a cause for increased pain
16  that, you know --  Over time, I've seen people have --  I saw
17  a patient who had a slip and fall and he had two golf balls
18  in his pocket and he fell and he fractured his femur, because
19  the golf balls created a vector of force that created the
20  fracture in his femur.  So it's only important in the sense
21  that a concealed weapon -- not because he has the concealed
22  weapon, now, you know, I don't really care whether he has a
23  weapon, but that could be that, that's a hard -- presumably,
24  a hard gun and just like the golf balls can create a leverage
25  effect on the hip.  As it was, he did not fracture his hip,

46

1  but it's noted and that would be a good reason for having a
2  big bruise.
3      Q.    Okay.  The statement or the sentence, the police
4  department was dispatched in order to sort through this
5  issue.  Does that --  Does that have any relevance at all to
6  your opinions or views in this case?
7      A.    No.  I'm just too verbose.
8      Q.    Yeah.  And then, continuing that paragraph, you --
9  you state that he had an abdominal aortic aneurysm four weeks
10 earlier.  Do you see that?
11     A.    Yes.
12     Q.    What does that mean?  What --  What is that?
13     A.    So he had --  Basically his abdominal aortic region
14 of his --  His abdominal aortic anatomy had basically shown
15 that the normal size of the aorta had enlarged and -- and
16 that's what an aneurysm is, is enlargement of blood vessel.
17 And if they get too -- too large of a size, they stand a
18 great -- a great risk of rupturing and if it did, the person
19 would die.  So he had had that repaired and that's, you know,
20 clearly seen on his x-rays and is well documented in his
21 medical records.
22     Q.    And what kind of surgeon performs that procedure?
23     A.    A vascular surgeon.
24     Q.    Is it a --  Is it a difficult, complicated
25 procedure?

47

1        A.    Since I don't perform them, I don't know how to

2   answer your question.  It --  It's certainly --  I think

3   patients have good outcomes when they're having a triple --

4   we call it a AAA repair.  The --  The key for treatment of

5   that is, is make sure you pick it up before it becomes too

6   large.  And so, obviously, his primary care doctors or

7   someone picked it up.

8        Q.    Okay.  Do you know anything about the recovery from

9   that type of procedure?

10       A.    It can be, if it's a open repair, it -- it can be

11  kind of a painful procedure to recover from.  And certainly,

12  the older an individual is, the harder the recovery is.

13       Q.    And is the -- the --  When someone has a surgery,

14  saying Mr. Harvey's age range and physical condition and has

15  that type of procedure done, is that --  Does that weigh on a

16  person's body and their immune system and their ability to,

17  you know --  Does it make it more susceptible to other

18  problems while they're recovering?

19       A.    Well, just like anyone that undergoes a major

20  surgery, you know, there are probably issues within the

21  surgery that can affect their recovery.  So if there's a lot

22  of blood loss then, yes, that does affect their immune

23  system and depletes them so that they have to -- they're --

24  they're, what we would call catabolic.  They're burning more

25  energy, so --  And that can last for several months after a

48

1  major operation.

2      Q.   Okay.  His wasn't -- was only four weeks before

3  this incident; is that correct?

4      A.   Yes.

5      Q.   Okay.  The --  The next paragraph, I just wanted to

6  ask you, there was a statement in the second line, post

7  cervical corpectomy.

8      A.   Yes.

9      Q.   What --  What is that?

10     A.   So status post means, he --  He, you know, he's

11 undergone a previous surgery.  And a cervical corpectomy

12 means the corpus meaning body, it's someone's removed the

13 entire vertebral body.  And in his case, it was the C5

14 vertebral body was completely removed.

15     Q.   And do you know when that surgery took place?

16     A.   You know, it was in the records.  I --    I know

17 Dr. Elshihabi did it.  I want to say it may have been 2014,

18 but I --  I don't really recall off the top of my head.

19     Q.   And does something like that leave a person more

20 susceptible or vulnerable to re-injuring themselves?

21              MR. PERNICIARO:  Object to the form.

22         Go ahead.

23 BY THE WITNESS:  (Resuming)

24     A.   So there's no doubt that does represent a change in

25 the -- the -- the mechanical motion of their cervical spine.

49

1  So, yes, in --  In theory, it probably does put the disc

2  above and below at risk for aging more rapidly than they

3  would otherwise.  Although, what we're finding through

4  various -- like disc replacement surgeries exist and we find

5  that people with disc replacement -- where they actually

6  still have motion, they're -- a lot of times they wear out

7  above or below the disc replacement.  Even though there's

8  still motion, they're wearing out.  So what we know --  It's

9  kind of a complex reason for people to wear out above and

10  below.  It probably --  Most of that is genetics.  If you're

11  like me, you got a lot of gray hair, although yours -- your

12  light is a little brighter than mine, but, you know, we can't

13  deny the genetics, that we're getting gray hairs and, you

14  know, so if Chris starts plucking his gray hairs thinking

15  he's not going to get any, he's a fool, because he's going to

16  keep --

17        Q.    Yeah.  I learned that lesson.

18        A.    He's going to keep getting them, so...

19        Q.    That's right.  That's right.

20              MR. YASHINSKY:   I think they grow

21        back faster that way, so just remember

22        that Chris.

23              MR. PERNICIARO:  I will.

24  BY MR. YASHINSKY:  (Resuming)

25        Q.    And, Doctor, just overall, I mean, obviously, in

50

1    your field you deal with a lot of people dealing with

2    degenerating -- degenerative conditions and degeneration in

3    their spines.  You would agree that everybody -- everybody

4    has degeneration, starting at a certain point in life and as

5    they get older, it tends to accumulate or become worse; is

6    that fair?

7         A.    Yeah.  So I --  I tell patients all the time, a

8    normal x-ray is around the age of 18.  So you've finished

9    your skeletal growth, but you really haven't started maturing

10   from the standpoint of, you know, the years that I have.  So

11   that's a normal x-ray, presumably around 18 years of age.

12   And then, so it's definitely going to be different as you

13   age, it's going to show degeneration.  So which means that

14   normal is somewhat of a moving target, depending on how old

15   you are.

16        Q.    And your general health otherwise, I presume?

17        A.    Oh yeah.  Obviously, if you're a smoker or you're

18   somebody who's obese or you're somebody who had a history of

19   beating up their body, say a professional athlete or maybe a

20   construction worker, they're going to have more findings than

21   somebody who --  And quite frankly, lawyers, who sit all the

22   time seem to have more back problems than people who are

23   standing and walking all the time.

24        Q.    All right.  And does --  A degenerative condition

25   doesn't necessarily mean they'll have pain, it just means

51

1    that their -- their aging process is moving forward?

2         A.    Correct.

3         Q.    And is it --  Is it true that if you've got more

4    degeneration, it may make you more susceptible to an injury

5    if you suffer a trauma or a traumatic event?

6         A.    It could be your weak point, so to speak.

7         Q.    All right.  And there's no question in your mind,

8    Mr. Harvey, before this fall, had significant degeneration?

9         A.    Correct.

10        Q.    And that would be in his neck and his lower back,

11   and I think you said thoracic, but not sure, but do you know?

12        A.    Yeah.  So his --  All of his x-rays document that

13   he's got degenerative changes in the cervical, thoracic and

14   lumbar region.

15        Q.    Okay.  And he was receiving treatment, I believe

16   you had said from Core Chiropractic and also from Pain

17   Solutions or Alliance, whatever it was called at the time,

18   before this happened?

19        A.    Correct.

20        Q.    Which --  Does that indicate to you that he was

21   probably having some neck and back pain --

22        A.    I would hope so.

23        Q.    -- before this?

24        A.    I would hope so if he's going to get treatment,

25   otherwise, what's the doctor doing, but...

52

1      Q.   Sure.  And do you know if at any point he stopped
2  treating at Core for any of those problems, before
3  this incident?
4      A.   As I recall, at Core he did -- there were --  He
5  did stop going to see them for a period of time, so --  In
6  fact, I think it seems like it was around 2012 or something
7  like that.  I'd have to look back at the dates.  I don't
8  recall off the top of my head.
9      Q.   And it may be in the report or I may be jumping
10 ahead of myself, but, I mean, it's not -- I mean we can --
11 If it's not 2012, I'll just show you where it says and you
12 can clarify it.
13     A.   Okay.
14     Q.   But with Pain Solutions, you had indicated that he
15 had been seen there as close to the incident as October 29th
16 of 2015, correct?
17     A.   Correct.
18     Q.   Do you know the extent of the treatment he was
19 receiving at Pain Solutions during that time frame before
20 this incident?
21     A.   Well, I --  Now I'm having to think off the top of
22 my head, but I'd have to go back and look.  It seems like he
23 had an injection or something maybe the early part of 2015,
24 but I can't recall the exact dates.  The --  The --  The
25 notes are kind of scrambled and I have to admit that their

53

1  notes are very difficult to follow.  And so in --  In fact, I
2  -- I'd have to look back to see the notation that there --
3  There was a page there that shows that he's seen at Pain
4  Solutions but it's like a list of dates, but I couldn't
5  necessarily always tie them to a note physically within the
6  record.  So it's hard to understand exactly how much
7  treatment he was getting.
8       Q.   Okay.  Trying to see if I can find that real quick.
9  I --  I believe --  You know, I'm going to --  I'm going to
10 come back to that just because it's down here and I want to
11 ask you a couple of other questions.  Would you agree that
12 before this incident at Kroger, Mr. Harvey had significant
13 degeneration in his neck and back?
14      A.   Yes.
15      Q.   And would you agree that the amount of treatment he
16 was receiving before the incident, was limited compared to
17 the amount of treatment he received after the incident?
18                MR. PERNICIARO:  Object to the form.
19 BY THE WITNESS:  (Resuming)
20      A.   Well, so that's kind of a difficult question to
21 answer.  I mean obviously, he did see more people after his
22 accident, the -- as my report will kind of suggest.  I mean
23 he has the surgery on his back, which, you know, there's some
24 --  I'm not saying Dr. Mortazavi was completely wrong for
25 doing the surgery, but suffice it to say, I'm not --  I'm not

54

1   altogether comfortable that he was clear on why the surgery
2   needed to be done, because as I mention in my report, the
3   pain diagrams don't show pain running down the legs of -- of
4   Mr. Harvey, which -- or into the butt cheeks and all.  It's
5   all back pain, which, again, with a lot of degenerative
6   changes is understandable, but as to whether surgery was
7   going to change that pain, would be the big question mark.
8   And then, of course, it's a little unclear as to why a fusion
9   was done and especially in light of where -- reading the
10  report, I'm being a little verbose here, it might -- these
11  may be questions you have later, but the report of the MRI
12  that was most recent in 2018, I believe that was the
13  timeline, it showed that there appeared to be worsening of
14  the foraminal stenosis at L4-5 and L5-S1, and -- and that
15  could of been on a later --   It's the more -- most recent
16  MRI that he had.  I don't remember the date of it.  I just
17  got it today, or looked at it today, but, nonetheless, that
18  -- and there was some reference that perhaps he needed more
19  surgery and -- which would suggest then it's possible if
20  there was a fusion done, which it sounds like there was, it
21  may not of healed and that's why he has continued to
22  degenerate in his lumbar spine.  Anyway, I've said a mouthful
23  there just answering --
24       Q.   Well --
25       A.   -- a direct question.

1    Q.    Yeah.  No.  I appreciate it because that -- those

2    are the opinions basically I'm going to be asking you about

3    anyway, but I did want to ask you, in your experience as a

4    surgeon, when you perform a -- a lumbar fusion or a cervical

5    fusion, does that guarantee the relief that you're trying to

6    give your patient?

7    A.    Obviously, it does not guarantee anything.

8    Q.    Okay.  You have had patients come back and say that

9    they have not recovered or felt the relief that they were

10   hoping to get from the surgery, I assume?

11   A.    Occasionally and gratefully, not that often, but,

12   yeah.  There are occasional patients who are not completely

13   satisfied with their result.  I don't -- And there's a lot

14   when you talk about satisfaction.  So to the point of you

15   guys who have your own clients, sometimes you do a great job

16   and your clients are still not satisfied without -- even

17   though you know you gave it your best and it may have even

18   turned out to -- to the Plaintiff or to the Defendant, in

19   favor of them, but they still didn't like the outcome.  So --

20   Q.    Right.

21   A.    -- I'm -- I'm --  I've got patients who are the

22   same way and I'm sure Dr. Mortazavi does, as well.

23   Q.    And when a patient does come back to you, who is

24   not happy with the way they're feeling after having a

25   surgery, what do you typically do?  Do you continue to treat

1  them or do you refer them somewhere else or you just tell

2  them they can't keep coming?

3      A.   Usually I'll keep working until I can understand

4  why they haven't gotten pain relief.  So you know, is their

5  fusion not healed or do they have -- they have another

6  problem?  Maybe we've missed something.  Maybe it was

7  something different the whole time.  So they, you know,

8  usually we'll look harder to find out why they're not pleased

9  with their outcome.

10     Q.   Okay.  I want to make sure I don't skip something

11 here.  And you indicate in the --  I'm on the second page,

12 the third paragraph, the third line down, talking about his

13 visit to WellStar Medical Group on November 17th, 2015.  And

14 you said that the complaint on his visit was neck and low

15 back pain; is that correct?

16     A.   Yes.

17     Q.   But you indicated there was no complaints of

18 radicular pain or weakness.

19     A.   Correct.

20     Q.   If --  If there had been complaints of radicular

21 symptoms going down his -- his leg or his -- well, going down

22 his leg, would you say that that was indicative of some type

23 of low back problem?

24     A.   So --  So it could be a lower back problem.  It

25 could be a hip problem.  So, you know, it could be a -- a

57

1    muscular problem.  I mean if you're feeling pain going down

2    the leg, you have to explore it and figure out why you have

3    pain in the leg.

4         Q.   And it looked like there was a -- and I'll show it

5    to you.  I don't have it on my screen, but in a visit dated

6    November 21st, 2015, there is a -- a circle, I don't know if

7    you can see that, drawn around his -- I think that's his

8    right leg.  Can you see that okay?

9         A.   I do.  Where is that from?

10        Q.   This is from WellStar Paulding Hospital and it's

11   from November 21st, 2015.

12        A.   Okay.

13        Q.   Would that be the type of note that you would

14   expect to see if -- if there was radiculopathy going on?

15        A.   That --  That's not the way you're supposed to fill

16   out a pain diagram.  If you circle --  The instructions

17   usually say use characters on the extremity or I don't know

18   how they have theirs listed, but a pain diagram is supposed

19   to tell you, you know, you have five different symbols to

20   kind of explain whether you have burning pain or stabbing

21   pain or numbness or whatever.  A circle, quite frankly, means

22   nothing because that doesn't really impart any knowledge as

23   to what is really bothering the patient about their leg.

24        Q.   Okay.  I got another one here.  And if he

25   complained of increased pain in his right leg over the last

58

1   few days, at that same visit, is that something you would
2   note as relevant to his complaints of back pain?
3       A.   Again, as I said before, you'd have to --  Someone
4   would have to examine him to understand why he was having
5   right leg pain.  I mean that could be neurogenic coming from
6   nerves.  It could be vasculogenic, especially in a guy with
7   the history of abdominal aortic aneurysm, you want to -- does
8   he have good pulses and is he got good blood flow.  And I'm
9   going to assume he did because he's still got his leg, I
10   guess, but -- and can it be skeletal, I mean, so can it be a
11   hip joint or the knee?  Sometimes people have knee problems
12   and it's referred up into their hip, of all places and vice
13   versa in their hip and it's referred to their knee.  So
14   anyway, it requires a complete examination, but the notes it
15   --  From the examinations that were there -- did not suggest
16   any extremity problem, at least, from Dr. Mortazavi, it was
17   serious back pain.
18       Q.   But that --  That is the type of notation that
19   you're looking for when you talk about extremity complaints?
20       A.   You broke up.  You broke up there.
21       Q.   Oh, I'm sorry.  That's what you're looking --
22   You're looking for indications of radiculopathy in the lower
23   extremities when you're dealing with potential herniation or
24   nerve issues going on with the lower back, right?
25       A.   Correct.

59

1      Q.   Okay.  In your review of the records, is there
2   something that would indicate whether it would be on his left
3   leg or his right leg, if was having radicular symptoms?
4      A.   So I believe --  I'm trying to read that note, but
5   it -- part of it gets obscured by the picture of you guys.
6   See if I can -- trying to --  Okay.
7      Q.   Okay.
8      A.   There was an annular tear and bulge in the right at
9   L5-S1, this is in his MRI into my reading, but no compression
10  of the nerve root.  There was some mild foraminal stenosis
11  noted at L4-5, to a lesser degree at L3-4.  And so that's all
12  there was that I was seeing.  Let's see.  And there was some
13  facet hypertrophy that was greater on the left than the right
14  at L5-S1.  So patients can also get, what is called facet
15  syndrome, and they have referred pain down their leg from a
16  degenerative facet.
17     Q.   Okay.  And can that be brought on by a traumatic
18  event?
19     A.   It can be aggravated by a -- a traumatic event.
20     Q.   All right.  And did you notice any findings in the
21  MRI that there was a -- a recent trauma?
22     A.   No.
23     Q.   What about the annular tear?
24     A.   So annular tears, they -- they can be acute or more
25  likely than not at his age group, they're chronic, you know

60

1  so there's no way... Over the years, radiologists have

2  helped me to understand that there's no way to discern if

3  there is a increased signal intensity in the disc suggestive

4  of a annular tear. You can't -- You really can't put an age

5  on it. So it -- And again, the more gray hairs you get

6  and/or the more years you have, the more likely your MRI is

7  going to show that you have some form of annular tear. As to

8  whether that's symptomatic or not is then the big question.

9        Q.   And there's no way to tell the age of it from the

10  MRI?

11        A.   Correct.

12        Q.   But it would be better to have an MRI shortly after

13  a traumatic event as opposed to waiting a year and then

14  seeing an annular tear, at which point it has no value,

15  correct? I mean it's possible because it was done so close

16  to the time that it was a traumatic finding for finding some.

17        A.   It is possible.

18        Q.   Yeah.

19        A.   So it's possible.

20        Q.   I know in -- in moving down in that same paragraph,

21  you talk about his visit to Dr. Mortazavi on January 8th,

22  2016. If he had indicated that he had pain in his leg or had

23  indicated there was pain traveling down his leg, would that

24  change your opinion as to how Dr. Mortazavi was treating him

25  or decided to treat him?

61

1        A.    Well, it certainly would, because, obviously, my

2   concern was, is he didn't have any pain drawing or complaints

3   of having extremity pain, except for the drawing of, and I

4   think I said there, some drawing of some left arm pain.

5        Q.    Okay.

6        A.    And if you did the left arm, I would have expected

7   him to do, you know, a leg.

8        Q.    Right.  Well, your sentence --  The next sentence

9   says, Dr. Mortazavi noted the patient had severe back pain,

10  which radiates to bilateral lower extremities.  So that would

11  be consistent with a report that it was his low back

12  traveling down his leg, wouldn't it?

13       A.    Well, so that's a --  That is obviously from the

14  subjective component of Dr. Mortazavi's history and physical

15  examination, but, you know, obviously, I followed up and said

16  there, there wasn't any documented leg pain and -- and that's

17  partially due to the pain diagram, but then, the neurological

18  examination didn't find anything abnormal.

19       Q.    Okay.  If there were any abnormalities in the

20  neurological examination during that time frame, would it

21  change your opinion as to what types of -- of treatment

22  Mr. Harvey needed?

23       A.    It --  It probably would.

24       Q.    Okay.  And then, here we go back --  I don't mean

25  to jump around, but the next sentence you talk about that he

62

1  was -- he was taking four Percocet per day at the time he
2  went to see Dr. Mortazavi after the fall.  And then you go
3  back and say, however, Mr. Harvey was being treated by Pain
4  Solutions just prior to the fall.  And I thought that you had
5  indicated that he was on one Percocet a day before the fall.
6  I may be wrong.  I don't see it right here, but does that
7  ring a bell at all with you?
8       A.   I believe my notation there was -- was to -- to --
9  and I didn't do a very good job of crafting this document,
10  but that he was taking, you know, pain medications --
11  Percocet, before the fall.  And then he was taking pain
12  medications afterwards, as well. So obviously, you know,
13  he's had ongoing pain that required treatment with opioids.
14       Q.   Okay.  And if he was taking fewer opioids, before
15  the fall, and increased those opioids along with the invasive
16  treatment he would have through Dr. Mortazavi, is that
17  indicative of somebody who has increased pain?
18       A.   One would presume that he's had a change in his
19  pain, which I -- I would agree was from an aggravation.
20  Again, you know, things obviously moved towards having
21  surgery, which to me was just increased pain medication usage
22  alone for somebody whose been taking pain medications for an
23  extended period of time.  They may have actual dependency.
24  And not to say that anything's wrong with Mr. Harvey, that's
25  just to say any of us, if we take opioids for an extended

63

1   period of time, we're going to have a dependency.  Which

2   means if you do have an injury of some sort, minor or major,

3   you're probably going to have to use a lot more pain

4   medication to get some effect, but that also means you're

5   going to ramp up your dependency even more, as well.

6        Q.   And --  And that's a -- that's a fair statement.

7   Is it in your experience, somebody who is treating the

8   dependency on pain pills, is that patient less likely to

9   actually have surgery than a person who isn't taking any pain

10  pills, but just wants to treat their injury?

11       A.   Can you ask that question again?

12       Q.   Yeah.  I don't think I can because it was a bad

13  question.  So let me try to restate it.  In your experience

14  of dealing with people who may have some dependency issues on

15  the pain medication, are those patients less likely to move

16  forward with surgery?

17       A.   Obviously, patients are going to move forward with

18  surgery if -- if it's recommended by the doctor to have

19  surgery.  In my experience, and I think most surgeons would

20  say the same on patients who have a dependency already to

21  opioids, the outcomes of surgery are harder to predict

22  because their pain tolerances have been changed because of

23  the opioids.  So you --  You have to kind of have a white

24  glove moment when you make a recommendation for surgery, you

25  -- you want to make sure you understand exactly what it is

64

1  that's causing their pain, to ensure that they have a good

2  outcome.

3      Q.  Okay.  Do you think that that presented any kind of

4  issues for Dr. Mortazavi based on what you saw as his -- his

5  past pain medication?

6      A.  I didn't really get that impression from reading

7  the notes.  I --  I think it --  It looked as though it was a

8  recommendation to move on towards surgery.

9      Q.  Okay.  And that surgery that he had recommended was

10  L4-5 laminectomy, correct?

11      A.  Yeah.  It's --  The notes are kind of interesting

12  to read there and that's because he makes a recommendation

13  for L4-5 laminectomy and then it suggests L4 to S1 and that's

14  what got done.  And then, of course, he never mentioned the

15  fusion and then he -- a fusion gets done, as well.  So I --

16  I'm not quite certain what all went on during the operation.

17      Q.  Okay.  And I know you -- you --  And that was

18  actually the next topic I wanted to address is, it --  It

19  seemed to me, at least, in the op report that Dr. Mortazavi

20  determined there was instability, which is what led him to do

21  the fusion; is that fair or am I just jumbling everything up?

22      A.  That's --  That's what he says in his operative

23  note.

24      Q.  Okay.  And, I know, you -- you disagree that there

25  was any findings in instability, correct?

1    A.   Yeah.  The pre-operative plain x-rays show no -- no
2  spondylolisthesis, no scoliosis, no slipping to the bones out
3  of position, so --  And then I read the operative note and I
4  couldn't see anything that he had done.  If you took out the
5  complete facet joints where there is no facet joints left,
6  that would certainly produce instability, but that's not what
7  he did.  So I'm not quite certain what made him decide to do
8  the uninstrumented fusion.
9    Q.   Okay.  Would you agree as a surgeon that when
10  you're -- you're actually inside the patient and -- and
11  working on him that, while you may not agree with
12  Dr. Mortazavi's decision or, you know, what his findings are,
13  just being a surgeon inside the patient and doing the
14  surgery, gives you the best opportunity to see what's going
15  on with them, that you might not get with all the films or
16  x-rays?
17    A.   Yes, to some degree.
18    Q.   And not just saying that it's -- they always make
19  the right choice or -- or read the right thing or do the
20  right thing, but in general, at least, the -- the surgeon has
21  got his eyes on what he's trying to fix and should have a
22  better view of it than anything outside of surgery.
23    A.    I would say to some degree, again and --  And the
24  main reason is, you know, years ago, when they didn't have CT
25  scans and MRIs, there's no doubt a surgeon's look inside was

66

1   a lot better, but with advanced imaging like we have now,

2   it's --  It's a rare day that I'll -- personally, that I

3   would go in and change my mind and do something different.

4        Q.    Okay.

5        A.    And I --  I would think the same with

6   Dr. Mortazavi.  So I'll --  I'll tip my hat and say he may

7   have seen something but he didn't explain it in his operative

8   note, to make you understand why.

9        Q.    Okay.  And you have --  I mean while it may not

10  happen often, you have been in surgery and decided there's

11  something that you have to address differently than what you

12  had anticipated.

13       A.    Yes, but it's usually like an additional level.

14       Q.    Okay.

15       A.    You know you get a fracture of a bone while you're

16  trying to do something, the bone fractures and you go, all

17  right.  Now I got to --  I got to go to another level to fix

18  that because I can't leave it that way, but that's in your

19  operative note, you understand clearly and you communicate

20  clearly.  So my, you know, again, I'm not going to criticize

21  what Dr. Mortazavi did, because he was trying to help the

22  patient, but he just didn't communicate well exactly why he

23  made that decision.  So it leaves me, as a reviewing surgeon,

24  going, there's no indication for a fusion based on what

25  little he said.  That's not to say that he did the patient

1   wrong, it's just it -- there's not a good indication.

2        Q.   That's fair.  So you --  You don't know from the

3   records what prompted him to make that decision.  And that's

4   really where you can't agree with his -- his treatment

5   because it's not supported by the findings that you are

6   reading about.

7        A.   Correct.

8        Q.   Okay.  We talked about the instability that he

9   noted, but that wasn't supported.  Is there anything that you

10  would see in a surgery, like the one he was performing, that

11  would be indicative of instability that might require a

12  fusion?

13       A.   So, you know, it would be unusual, but if the --

14  because the patient already had good x-rays, but if the

15  patient was under anesthesia and you saw a significant

16  slippage of the bones or spondylolisthesis, that would be a

17  reason to do a fusion, but, again, I would have expected that

18  in the --  That's why we have a preoperative diagnosis and

19  postoperative diagnosis.  Instead of just instability, it

20  would've said, spondylolisthesis was seen, and -- and, of

21  course, that's not the case.  So I mean, yeah, I forget what

22  your question was now, so...

23       Q.   Well, that answers it.  I mean you're basically

24  saying what -- what he could've noted if he found it, that

25  would've supported his decision, you're just not seeing it in

68

1  his records.

2      A.    Correct.

3      Q.    Now throughout all this, you know, back treatment

4  he was receiving, do you agree that Mr. Harvey was also

5  complaining of increased neck pain or cervical pain

6  throughout that time, as well, correct?

7      A.    He was, but, obviously, the way the notes kind of

8  play out, it would appear that the neck was not as much of a

9  -- a complaint as the lower back was.

10     Q.    Okay.  Oh, actually, you just --  You wrote that in

11  your report, throughout treatment with Dr. Mortazavi, there

12  was no discussion regarding the cervical spine requiring any

13  significant treatment.  That's consistent with what you just

14  told me, right?

15     A.    Correct.

16     Q.    All right.  Now -- But he was receiving some

17  treatment for his neck?

18     A.    He was and he had been for years to some degree.  So

19  again, a preexisting --  And, obviously, he had surgery the

20  year before, I believe.  I have to look back and cheat from

21  my notes to remember when he had that surgery.  (Witness

22  retrieves documents.)  Yeah, March of -- March of 2014 is

23  when Dr. Elshihabi had done the fusion.  So yeah.  So had

24  neck pain complaints; although, again that did not appear to

25  be the major complaint of his at the time.

69

1        Q.   Do you know why Dr. Elshihabi did the cervical
2   fusion, as opposed to Dr. Mortazavi, if you know?
3        A.   No, I don't -- don't know.  I don't recall from
4   notes and --  And that would be probably a decision that
5   Mr. Harvey made over one doctor over the other.  I --  I
6   don't know.
7        Q.   Okay.  And the next part of the report I want to
8   you ask you about, I know you pretty much explain it, but you
9   said that it's surprising that the Alliance Spine/Pain
10  Solutions had recommended the radial frequency ablations
11  because the fusions would have prevented that from being any
12  help to him at all anyway, correct?
13       A.   Correct.  Although, I have to admit I -- I -- I
14  don't know if this was -- and I didn't reread my report
15  before I sent it to the Counsel, but I've got down there
16  radial frequency ablation of 3-4, 4-5.  I probably meant to
17  say 4-5, 5-1, because the radial frequency ablation was L3
18  through the sacrum and the fusion was done at 4-5 and 5-1.
19  So --
20       Q.   Okay.
21       A.   -- anyway, so the --
22       Q.   You have --
23       A.   Yeah.
24       Q.   That was something that I wanted to clear up is the
25  --  In the report it says, I believe it says that there

70

1  fusion was L3-4 and L4-5, but that's -- that's a mistake,

2  right?

3       A.    That's a mistake.  It was 4-5 and 5-1.

4       Q.    Right.

5       A.    But --  But my reasoning for saying that is -- is

6  when you do a fusion, posterior laterally, like was performed

7  by Dr. Mortazavi, you remove the facet joint axel, which has

8  all the nerve endings.  You remove that so it's bare bone and

9  then that's what you decorticate, in other words, you drill

10 it or you take a rongeur and bite the bone off to make it

11 bleed.  And then --  So --  So since -- to start doing radial

12 frequency ablation, there is no nerves to ablate. Maybe at

13 L3-4, but it's totally --  It makes no sense that someone

14 even -- would even try because there's nothing there to

15 ablate --

16      Q.    I see.

17      A.    -- at 4-5 and 5-1.

18      Q.    Okay.  And then I understood then, you called it a

19 sham operation, but that's what you're saying is because

20 there was no -- there's no indication that that would do

21 anything because the nerve roots aren't being pinched,

22 there's no nerve there.

23      A.    So --  So assuming that the fusion has formed, and

24 maybe not complete, but it's formed in some fashion.  If you

25 go down there burn, you're burning bone.  You're not burning

71

1    any nerves, there are no nerves where those facet joints
2    were, because you did a fusion --
3        Q.   Right.
4        A.   -- so or somebody did a fusion.  So the only area
5    that would've been indicated to treat would of been at L3-4
6    level if -- if, in fact, that needed to be done.
7        Q.   Okay.  Okay.  And there is never a reason to do a
8    radial frequency ablation in -- on a space that's already
9    been fused; is that accurate?
10       A.   It --  It's accurate and --  And let just qualify
11   that and say that if somebody had done an anterior fusion,
12   where the facet capsules had not been removed, then that
13   would make some sense.  Even if you had a fusion of
14   (pixelated audio), if you thought somehow the facet joints
15   had not -- and you probably would only do this if you'd
16   thought your fusion had yet to heal.  You might have
17   somebody, you know, inject a medial branch block -- do what's
18   called a medial branch block or you would do an injection of
19   the facet joints, to then decide if a radial frequency was --
20   but again, that's not the case here, so...
21       Q.   Right.  Did they do medial branch blocks before the
22   ablation, do you know?
23       A.   I can't --  I can't recall off the top of my head.
24   I --  I think they did, but, I mean, if you -- if you're
25   trying to get an insurance company to pay for it, you -- you

72

1    better do a medial branch block or they're not going to agree
2    to pay for it.  It --  It --
3        Q.    Right.  And that's to diagnose whether it's going
4    to be helpful.
5        A.    Exactly.
6        Q.    Okay.  Okay, but the -- but the --  Just going back
7    to the where you talk about the --  I was trying to see where
8    --  The L3-4 references was just more of a typo than anything
9    else, is what I'm gathering?  You're talking about the --
10       A.    I can't hear you.
11       Q.    I'm sorry.  The --  The reference to L3-4 having
12   been fused and not being helpful, that was a typo.
13       A.    That was correct.
14       Q.    Okay.  I don't have a whole lot more doctor, but
15   let me see.  And going to the last paragraph on that page,
16   and I'm on page 3 still, you state, and the fall appears to
17   have aggravated his pre-existing conditions of neck and lower
18   back pain.  So you agree that the fall did have an impact on
19   him because of his pre-existing conditions?
20       A.    Yes.
21       Q.    And, in your opinion, just based on what you could
22   see in the video from the fall, knowing Mr. Harvey's medical
23   history, and knowing his physical condition, and his
24   recovering from surgery, and having the cervical fusion,
25   would you agree that a fall of that magnitude could cause

73

1    somebody neck and back pain if they're in his condition?

2        A.    Well --  Well, again, cause would -- to say --  At

3    least the way I heard that, cause would suggest he didn't

4    have it before.  So cause, exacerbation --

5        Q.    Aggravation.

6        A.    -- or aggravation, yes.

7        Q.    Okay.

8        A.    It could be that.

9        Q.    Okay.  So you would agree that, if nothing else,

10   there certainly could be -- have been an -- or there was an

11   aggravation of his prior problems --

12       A.    Correct.

13       Q.    -- in his neck and back?

14       A.    Yeah.

15       Q.    Okay.  And is it reasonable to presume that someone

16   in Mr. Harvey's physical condition is more likely to suffer

17   an injury from a fall like that than somebody who is a

18   perfectly healthy 20 year old with no pre-existing

19   complaints?

20       A.    So again, an individual who has preexisting and --

21   and/or chronic neck and lower back pain, yes, they're more

22   likely to get an aggravation from a fall, than some young

23   asymptomatic individual.

24       Q.    Okay.  I'm almost done.  In your opinion,

25   Mr. Harvey -- the surgery that Dr. Mortazavi performed was

1  not indicated in the diagnostic films that were performed
2  after this fall?
3      A.   I felt, and I think I say there, you know, that I
4  felt that it was imperative the patient have more
5  conservative treatment before surgery would of been
6  undertaken.  I think we also talked about earlier, I don't
7  think it was clearly understood as to what the source of his
8  pain was.  So it's for those reasons, I believe --  And I
9  believe Dr. Mortazavi meant to help Mr. Harvey, but I think
10  the surgery, in my opinion, was rushed and, therefore,
11  unindicated because it wasn't clear as to what was causing
12  his pain.  And whether that pain was actually a -- just an
13  aggravation is more likely than not, in my opinion, to be the
14  reason why he was hurting so much, was the aggravation.  His
15  spinal stenosis clearly was there beforehand because it --
16  that in of itself is a degenerative process.  So just because
17  you see radiographic stenosis, which in -- in my mind was
18  even mild at that, but nonetheless there, that was there
19  before the fall.  So if it was aggravated then you, you know,
20  in my opinion, you should do everything you can do to get the
21  aggravation to go away conservatively before you would jump
22  to surgery, because most certainly the surgery then changes
23  his condition on a permanent basis, because he's no longer
24  what he was before.
25      Q.   Okay.  And if --  If a patient like Mr. Harvey had

75

1  gone through more conservative treatment and continued to

2  have the same complaints, you would not necessarily be

3  critical of the decision to perform, at least try the

4  laminectomy, if his complaints remained consistent throughout

5  that process?

6      A.   I would have to have more diagnostic evidence that

7  a decompression was going to actually benefit the patient.

8      A.   I feel --  I cannot say based on the amount of

9  information that's available as to whether surgery

10 futuristically --  And again, hypothetically, if it had not

11 been done would it be indicated later in the same manner?

12 Again, there's not enough information to say so.

13     Q.   Okay.  Right.  Had he had that more additional

14 conservative care that would of given you more information to

15 consider whether that was the best move forward.

16     A.   Correct.

17     Q.   And you also --  Your opinion is that there, based

18 on the report and the diagnostics that you reviewed -- the

19 operative report and the diagnostics, you didn't see any

20 indication that a fusion was necessary even after --  Well,

21 forget that last --  Let me withdraw that question.  You

22 didn't see anything in the surgical report that you felt

23 justified actually doing the fusion?

24     A.   Correct.

25     Q.   But you would agree that there could of been

76

1  reasons Dr. Mortazavi did it that are not set -- set forth in
2  the report, based on what he found when he was doing the
3  surgery, but you just don't have any evidence to know what
4  that would of been?
5       A.   You're correct.  I have no evidence to know what
6  that would of been.
7       Q.   Okay.  Just going to the last page, Doctor, my
8  other opinion is that the cervical spine condition was
9  aggravated by the fall, but his condition has fully resolved
10  to its pre-injury status.
11      A.   Correct.
12      Q.   Do you know at what point you would have made that
13  determination that he had fully resolved to his pre-injury
14  status?
15      A.   Given the fact that it's not mentioned at all in
16  Dr. Mortazavi's records and follow up, it's my opinion that
17  his neck, his exacerbated or aggravated neck symptoms had
18  resolved.  I believe he had returned to his baseline chronic
19  neck pain.
20      Q.   Okay.  Would you recommend a patient like
21  Mr. Harvey for pain management based on what you saw his
22  complaints -- following the surgery?
23      A.   Well, you -- You need to know that I try not to
24  ever send a patient to pain management, so...  And I find
25  it's not that they can't help people but if I do, it's

77

typically what is called rehabilitative pain management,
where opioids are not utilized.  And so physical therapy and
maybe some injection or non-opioid type medications are
utilized, but again, that's a rare day that I do that.  But
chronic pain management from the standpoint of what we call
terminal pain management, which is more like what Mr. Harvey
is in, I do not recommend patients to that.  That's terminal
being as you can understand patients who have terminal
illnesses that's appropriate, but he does not have a terminal
illness.

    Q.   And what would you recommend for somebody who is
just complaining of this, you know, ongoing pain and -- and
not seeming to get any kind of results?  Is a patient like --
And you don't want to send them for medications and pain
management along those lines.  Is there something that you
would recommend to a patient like that to try and manage his
-- his symptoms?

    A.   I, obviously --  I --  I'm sure I would.  I guess I
would have to, you know, see the patient, examine the patient
and make a decision based on what I find at that time.  So I
mean I can't --  It's hard for me to say because, you know,
that's the -- the downfall for doing record reviews, you
don't get to lay hands on the patient.

    Q.   And that, obviously as a doctor, especially a
surgeon is the most important thing when it comes to

78

1   treatment is actually seeing and talking to the patient and
2   having your hands on them.
3       A.   Correct.
4       Q.   Okay.  All right.  Doctor, are there any other
5   opinions that we haven't talked about today that you think
6   are relevant to this case that you'd like to share?
7       A.   No.  Not to my knowledge.
8       Q.   Okay.  Well, in that case, I think -- I'm sure I
9   have more questions somewhere written down, but, you know,
10  it's getting late in the day and you've been very helpful and
11  -- and I appreciate your time.  So I don't have anything
12  further.
13              MR. PERNICIARO:  Dr. Silcox, do you
14          want to reserve the right to review the
15          transcript and note any inaccuracies?
16              THE WITNESS:  Absolutely.
17              MR. PERNICIARO:  Okay.  So we'll --
18          we'll reserve signature please,
19          Ms. Court Reporter.
20              COURT REPORTER:  Okay.  And, Chris,
21          do you want a hard copy or e-tran?
22              MR. PERNICIARO:  Just e-tran,
23          please.
24              COURT REPORTER:  Okay.
25              VIDEOGRAPHER:  Off the record at

79

1          5:01 p.m.

2               (Whereupon, the above-entitled

3          matter was concluded at 5:01 p.m.)

4                          o0o

5

6

7

CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA    )

COUNTY OF FULTON    )

I, Carin M. Holmes, Certified Court Reporter, 2806, hereby certify that the foregoing transcript of deposition as stated in the caption consisting of page 4 through 79, was taken down by me and then transcribed under my supervision, and that the same is a true, correct, and complete transcript of the evidence given by the witness, who was first duly sworn by me.

I further certify that I am a disinterested party to this action and that I am neither of kin or counsel to any of the parties hereto.

This certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done by the undersigned certified court reporter and original signature and seal is attached thereto.

IN WITNESS WHEREOF, I hereby affix my hand on this the 20th day of October, 2021.

Carin M. Holmes
CERTIFIED COURT REPORTER, 2806

81

DISCLOSURE

STATE OF GEORGIA                 Deposition of Hal Silcox, M.D.

COUNTY OF FULTON


        Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Counsel of Georgia, I make the following disclosure:

        I am a Georgia Certified Court Reporter.  I am here as an independent contractor.

        I was contacted by the offices of the taking attorney to provide court reporting services for this deposition.  I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C.

        I have no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  I will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.


_____                              _____
Carin M. Holmes
Certified Court Reporter, 2806

82

10/5/2021/hal silcox md/CMH/clh-aw

E R R A T A   S H E E T

    I hereby certify that I have read the foregoing and
within pages 4 through 79 and no changes are required:


                    _____
                    HAL SILCOX, M.D.

    Sworn to and subscribed before me this ___day of
_____, 2021.


                    _____
                    NOTARY PUBLIC

    My commission expires _____.



                    ************

    I hereby certify that I have read the foregoing and
within pages 4 through 79 and I wish to make the following
changes:

Page: ___    Line: _____
Page: ___    Line: _____
Page: ___    Line: _____
Page: ___    Line: _____
Page: ___    Line: _____
Page: ___    Line: _____
Page: ___    Line: _____
Page: ___    Line: _____
Page: ___    Line: _____
Page: _____    Line: _____



                    _____
                    HAL SILCOX, M.D.

    Sworn to and subscribed before me this ____day of
_____, 2021.


                    _____
                    NOTARY PUBLIC

    My commission expires _____.

THOMAS HARVEY vs.
THE KROGER CO.

The remote video-conference deposition of HAL SILCOX, MD
October 5, 2021

## $

**$125,000 (1)**
19:21
**$2800 (3)**
7:17;8:7;11:2
**$3500 (4)**
16:18,21;17:6;26:9

## §

**§9-11-28c (1)**
4:5

## A

**AAA (1)**
47:4
**abdominal (4)**
46:9,13,14;58:7
**ability (2)**
22:9;47:16
**ablate (2)**
70:12,15
**ablation (6)**
15:1;69:16,17;
70:12;71:8,22
**ablations (2)**
14:14;69:10
**able (2)**
25:13;42:5
**abnormal (1)**
61:18
**abnormalities (1)**
61:19
**above (4)**
29:7;49:2,7,9
**above-entitled (1)**
79:2
**abrasion (2)**
44:9,10
**Absolutely (1)**
78:16
**accident (6)**
21:14,15;31:1;40:3,
15;53:22
**account (1)**
41:11
**accumulate (1)**
50:5
**accurate (2)**
71:9,10
**active (2)**
20:13;36:17
**actual (4)**
16:5;27:25;41:9;
62:23
**actually (22)**
7:9,10;12:10,10;
15:17;17:2;20:9,19,
24;23:14;43:13,18,
23;49:5;63:9;64:18;

65:10;68:10;74:12;
75:7,23;78:1
**acute (1)**
59:24
**add (1)**
37:22
**addition (2)**
18:1;31:13
**additional (7)**
7:16;17:5,10;30:18;
34:2;66:13;75:13
**address (2)**
64:18;66:11
**administrative (9)**
8:13;10:7;17:14;
23:22;26:1;28:14,19;
29:19;36:23
**admit (2)**
52:25;69:13
**advanced (1)**
66:1
**advised (1)**
9:5
**affect (2)**
47:21,22
**affiliated (1)**
12:10
**afternoon (2)**
5:2,4
**afterwards (1)**
62:12
**again (29)**
24:4;25:25;28:2,3;
31:8,20;36:4;37:6;
40:4;41:1,16;44:4,20;
54:5;58:3;60:5;62:20;
63:11;65:23;66:20;
67:17;68:19,24;
71:20;73:2,20;75:10,
12;77:4
**age (7)**
47:14;50:8,11,13;
59:25;60:4,9
**aggravated (5)**
59:19;72:17;74:19;
76:9,17
**aggravation (8)**
62:19;73:5,6,11,22;
74:13,14,21
**aging (2)**
49:2;51:1
**ago (5)**
26:10;33:21;34:7;
37:15;65:24
**agree (14)**
43:8;50:3;53:11,15;
62:19;65:9,11;67:4;
68:4;72:1,18,25;73:9;
75:25
**agreed (2)**
6:7;9:6
**ahead (3)**
29:17;48:22;52:10

**aid (1)**
44:3
**air (1)**
43:9
**Alliance (2)**
51:17;69:9
**almost (4)**
11:23;20:4;37:12;
73:24
**alone (1)**
62:22
**along (3)**
45:5;62:15;77:15
**although (6)**
42:7;43:6;49:3,11;
68:24;69:13
**altogether (1)**
54:1
**always (3)**
37:9;53:5;65:18
**Amand (1)**
21:22
**ambulance (1)**
30:3
**amount (9)**
7:19;8:10;18:1,22;
41:14;42:2;53:15,17;
75:8
**anatomy (1)**
46:14
**and/or (2)**
60:6;73:21
**anesthesia (1)**
67:15
**aneurysm (3)**
46:9,16;58:7
**annular (6)**
59:8,23,24;60:4,7,
14
**anterior (1)**
71:11
**anticipated (2)**
5:12;66:12
**anything's (1)**
62:24
**aorta (1)**
46:15
**aortic (4)**
46:9,13,14;58:7
**apologize (1)**
23:3
**appear (2)**
68:8,24
**appeared (1)**
54:13
**appears (1)**
72:16
**appreciate (5)**
29:8;32:5,8;55:1;
78:11
**appropriate (1)**
77:9
**approved (1)**

**35:25**
**area (1)**
71:4
**arm (2)**
61:4,6
**around (6)**
41:19;50:8,11;52:6;
57:7;61:25
**assemble (1)**
17:3
**assistant (9)**
8:13;10:7;17:14;
23:22;26:1;28:14,19;
29:19;36:23
**assume (6)**
21:9;23:21;25:25;
27:21;55:10;58:9
**assuming (3)**
7:2;31:10;70:23
**assumptions (2)**
41:10;42:6
**asymptomatic (1)**
73:23
**athlete (1)**
50:19
**Atlanta (2)**
30:3;36:8
**attention (3)**
24:12,14;45:1
**Attorney (9)**
5:6;16:25;17:22;
21:4,9;22:24;32:11,
22;33:14
**attorneys (6)**
17:3,22;35:14;36:3,
12;41:12
**audio (1)**
71:14
**available (1)**
75:9
**average (2)**
19:25;24:3
**aware (5)**
6:15;10:6,7;22:12;
29:6
**away (1)**
74:21
**axel (1)**
70:7

## B

**back (36)**
26:4,12;30:6;36:24;
38:23;49:21;50:22;
51:10,21;52:7,22;
53:2,10,13,23;54:5;
55:8,23;56:15,23,24;
58:2,17,24;61:9,11,
24;62:3;68:3,9,20;
72:6,18;73:1,13,21
**background (3)**
16:3;40:19;42:16

**bad (1)**
63:12
**balls (3)**
45:17,19,24
**banana (6)**
39:19;42:11,13,14,
15,25
**bare (1)**
70:8
**base (2)**
13:19,20
**Based (14)**
8:17;9:5;19:5;
27:21;28:21;40:24;
64:4;66:24;72:21;
75:8,17;76:2,21;
77:20
**baseline (1)**
76:18
**basically (7)**
40:4;41:21;42:13;
46:13,14;55:2;67:23
**basis (3)**
14:17;16:22;74:23
**beating (1)**
50:19
**become (1)**
50:5
**becomes (1)**
47:5
**beforehand (1)**
74:15
**begin (1)**
4:10
**behalf (1)**
29:9
**bell (1)**
62:7
**below (3)**
49:2,7,10
**benefit (4)**
39:21;42:12,21;
75:7
**best (3)**
55:17;65:14;75:15
**better (5)**
25:13;60:12;65:22;
66:1;72:1
**bias (1)**
41:24
**biased (1)**
41:22
**big (4)**
18:7;46:2;54:7;
60:8
**bilateral (1)**
61:10
**bill (3)**
10:24;17:19;26:6
**billing (1)**
17:17
**binders (2)**
30:13,14

Case 1:20-cv-04803-CAP    Document 56    Filed 04/21/22    Page 85 of 96
THOMAS HARVEY vs.                    The remote video-conference deposition of HAL SILCOX, MD
THE KROGER CO.                                                    October 5, 2021

biomechanical (4)
13:5;41:10,18;42:5
biomechanics (4)
13:2,4;40:20;41:3
bit (3)
5:10;16:3;33:18
bite (1)
70:10
bleed (1)
70:11
bleeding (4)
44:6,13,22,23
block (3)
71:17,18;72:1
blocks (1)
71:21
blood (3)
46:16;47:22;58:8
Board (3)
12:15,18;41:1
Boards (1)
13:5
body (7)
43:10,10;47:16;
48:12,13,14;50:19
bone (5)
66:15,16;70:8,10,
25
bones (3)
44:19;65:2;67:16
bothering (1)
57:23
bottle (1)
23:6
bottom (1)
43:1
boxes (2)
18:4,7
branch (4)
71:17,18,21;72:1
break (2)
27:5,9
breakdown (1)
19:12
Brieske (1)
21:22
brighter (1)
49:12
bring (1)
11:1
broke (2)
58:20,20
brought (1)
59:17
bruise (1)
46:2
bruised (1)
45:8
bulge (1)
59:8
burn (1)
70:25
burning (4)

47:24;57:20;70:25,
25
busy (1)
28:22
butt (1)
54:4

# C

C5 (1)
48:13
calendar (1)
23:22
call (8)
10:21;15:15;16:24;
19:14;21:3;47:4,24;
77:5
called (8)
11:12;28:12;38:23;
51:17;59:14;70:18;
71:18;77:1
came (5)
29:4;30:14;34:6,23;
44:3
can (44)
6:2;8:1;9:19,25;
11:7,8,8,16;16:3;
17:22;26:13,22;27:1,
3,9,11;29:24;30:1,13;
31:22;39:20;41:13;
45:24;47:10,10,21,25;
52:10,12;53:8;56:3;
57:7,8;58:10,10;59:6,
14,17,19,24;63:11,12;
74:20;77:8
can't (26)
26:18;32:20;33:5;
35:1,19;36:13;39:24;
42:2,7,25;43:12,15,
19,20;44:9;49:12;
52:24;56:2;60:4,4;
66:18;67:4;71:23;
72:10;76:25;77:21
capsules (1)
71:12
care (7)
16:11;20:9,11;
31:11;45:22;47:6;
75:14
Carin (1)
4:16
case (47)
5:7,13;6:16;16:16;
17:11,19;18:10,15;
19:12;20:18,24;21:1;
22:6,11,15,25;24:8,
20;25:5,19;27:14,21,
23;28:7,9;29:2,7,9;
31:16;32:23;33:15;
35:15,18;37:10,19;
38:22;39:2,18;41:15;
42:22;45:11;46:6;
48:13;67:21;71:20;

78:6,8
cases (13)
21:23,25;22:3;
23:16;24:22;25:6,7,
10,14;36:11,15;37:3,7
catabolic (1)
47:24
cause (5)
45:15;72:25;73:2,3,
4
caused (1)
44:23
causing (2)
64:1;74:11
center (1)
34:25
Centers (1)
30:10
centralized (1)
30:8
certain (13)
13:14;23:4;28:11,
15;30:11;31:9,23;
35:21,23;37:11;50:4;
64:16;65:7
certainly (9)
13:24;28:16;43:24;
47:2,11;61:1;65:6;
73:10;74:22
certification (2)
12:18;41:2
certifications (2)
12:17;13:8
certified (1)
12:15
cervical (11)
14:2;48:7,11,25;
51:13;55:4;68:5,12;
69:1;72:24;76:8
CFO (2)
10:19,19
challenge (1)
22:6
challenged (1)
22:9
Chang (1)
14:19
change (10)
10:18;34:2,4,8;
48:24;54:7;60:24;
61:21;62:18;66:3
changed (2)
20:7;63:22
changes (5)
9:6;39:13;51:13;
54:6;74:22
characters (1)
57:17
charge (8)
7:16;11:4;16:15,21,
25;17:1,4,10
charges (2)
9:5;17:13

cheat (1)
68:20
check (1)
32:2
cheeks (1)
54:4
chiropractic (3)
30:3,7;51:16
choice (1)
65:19
Chris (7)
5:21;9:3,24;31:22;
49:14,22;78:20
chronic (4)
59:25;73:21;76:18;
77:5
circle (3)
57:6,16,21
circumstance (2)
21:20;35:20
claim (1)
20:20
clarify (1)
52:12
clear (4)
34:13;54:1;69:24;
74:11
clearly (5)
46:20;66:19,20;
74:7,15
client (1)
29:9
clients (2)
55:15,16
Clinic (5)
10:4;12:1;14:17;
18:25;19:1
clinical (1)
19:3
clip (1)
30:2;39:20;42:20
close (2)
52:15;60:15
clues (1)
40:13
Cobb (2)
30:8,9
coccyx (1)
13:20
cold (1)
23:10
collections (1)
19:17
comfortable (1)
54:1
coming (2)
56:2;58:5
comments (1)
29:11
communicate (2)
66:19,22
communication (1)
6:24

comp (2)
35:25;37:8
company (2)
36:4;71:25
compared (1)
53:16
complained (1)
57:25
complaining (2)
68:5;77:12
complaint (3)
56:14;68:9,25
complaints (10)
56:17,20;58:2,19;
61:2;68:24;73:19;
75:2,4;76:22
complete (4)
31:10;58:14;65:5;
70:24
completely (3)
48:14;53:24;55:12
complex (1)
49:9
complicated (1)
46:24
complied (1)
4:4
component (1)
61:14
compression (1)
59:9
concealed (3)
45:8,21,21
concern (1)
61:2
concluded (1)
79:3
condition (8)
47:14;50:24;72:23;
73:1,16;74:23;76:8,9
conditions (3)
50:2;72:17,19
conference (2)
31:15,18
confusing (1)
5:15
confusion (1)
6:17
conservative (3)
74:5;75:1,14
conservatively (1)
74:21
consider (2)
14:21;75:15
considered (1)
19:2
consistent (3)
61:11;68:13;75:4
construction (1)
50:20
consultation (2)
17:7;32:13
contact (2)

Case 1:20-cv-04803-CAP    Document 56    Filed 04/21/22    Page 86 of 96

THOMAS HARVEY vs.                                    The remote video-conference deposition of HAL SILCOX, MD
THE KROGER CO.                                                                        October 5, 2021

29:11,15
**contacted (5)**
28:18;29:1,13,16,
18
**contingency (1)**
26:16
**continue (1)**
55:25
**continued (2)**
54:21;75:1
**continuing (1)**
46:8
**conversation (4)**
16:19;33:18,20;
34:1
**COO (1)**
10:20
**copy (2)**
29:23;78:21
**cord (1)**
15:17
**core (4)**
41:4;51:16;52:2,4
**corner (1)**
43:2
**corpectomy (2)**
48:7,11
**corporate (1)**
10:2
**corpus (1)**
48:12
**cost (1)**
18:1
**could've (5)**
24:15;25:4;28:15;
37:5;67:24
**couldn't (5)**
28:11;36:13;42:14;
53:4;65:4
**Counsel (6)**
6:20;20:24;21:16;
29:2;37:25;69:15
**Counsel's (2)**
20:18;37:18
**Counsel's (1)**
20:18
**couple (2)**
34:25;53:11
**course (4)**
13:16;54:8;64:14;
67:21
**court (9)**
4:3,11,17;22:3;
30:3;36:18;78:19,20,
24
**COVID (1)**
14:8
**crafting (1)**
62:9
**create (1)**
45:24
**created (2)**
45:19,19

**creates (1)**
41:6
**critical (1)**
75:3
**criticize (1)**
66:20
**CROSS-EXAMINATION (1)**
11:14
**CT (1)**
65:24
**currently (1)**
11:20
**curriculum (1)**
41:4

# D

**Daniel (1)**
11:18
**dark (1)**
42:15
**date (2)**
31:23;54:16
**dated (3)**
29:4;37:25;57:5
**dates (3)**
52:7,24;53:4
**Daubert (1)**
22:6
**day (5)**
62:1,5;66:2;77:4;
78:10
**days (1)**
58:1
**deal (2)**
11:8;50:1
**dealing (4)**
32:11;50:1;58:23;
63:14
**decide (1)**
65:7;71:19
**decided (2)**
60:25;66:10
**decision (7)**
65:12;66:23;67:3,
25;69:4;75:3;77:20
**decompression (1)**
75:7
**decorticate (1)**
70:9
**dedicated (1)**
16:4
**deemed (1)**
22:14
**Defendant (5)**
4:25;29:7;35:18;
36:11;55:18
**Defense (17)**
6:20;16:8,12,14,16;
20:17,18,24;21:9,16;
22:19;24:23;25:12;
26:15;27:23;29:1;
37:25

**definitely (1)**
50:12
**degenerate (1)**
54:22
**degenerating (1)**
50:2
**degeneration (6)**
50:2,4,13;51:4,8;
53:13
**degenerative (6)**
50:2,24;51:13;54:5;
59:16;74:16
**degree (7)**
12:7;13:5;40:23;
59:11;65:17,23;68:18
**degrees (1)**
13:7
**Delta (1)**
10:17
**deny (1)**
49:13
**department (2)**
45:9;46:4
**dependency (6)**
62:23;63:1,5,8,14,
20
**depending (1)**
50:14
**depletes (1)**
47:23
**deposed (2)**
11:13;36:25
**deposition (23)**
5:9,24;6:10,12,18;
7:4,8,21,24;9:9;10:10,
14;11:3,9;17:17,19;
22:2,22;23:19;30:2;
33:19,23;37:23
**depositions (6)**
8:22;9:22;10:5;
20:8,10;24:2
**detail (1)**
43:25
**determination (1)**
76:13
**determined (1)**
64:20
**diagnose (1)**
72:3
**diagnosis (2)**
67:18,19
**diagnostic (2)**
74:1;75:6
**diagnostics (2)**
75:18,19
**diagram (3)**
57:16,18;61:17
**diagrams (1)**
54:3
**didn't (17)**
6:12;12:24;23:5;
43:23;44:18;55:19;
61:2,18;62:9;64:6;

65:24;66:7,22;69:14;
73:3;75:19,22
**die (1)**
46:19
**difference (1)**
9:5
**different (11)**
8:17;14:3;15:1,8,
13;18:3;36:24;50:12;
56:7;57:19;66:3
**differently (2)**
26:2;66:11
**difficult (4)**
43:6;46:24;53:1,20
**direct (1)**
54:25
**directly (1)**
19:5
**disagree (1)**
64:24
**disc (5)**
49:1,4,5,7;60:3
**discern (1)**
60:2
**discovery (2)**
5:10,24
**discussion (1)**
68:12
**dispatched (2)**
45:9;46:4
**distinguish (1)**
42:14
**distracted (1)**
26:11
**Doctor (15)**
9:21;11:16;15:1,8;
19:4;27:20;38:6;
49:25;51:25;63:18;
69:5;72:14;76:7;
77:24;78:4
**doctor's (1)**
27:16
**doctors (4)**
14:24;19:1;35:24;
47:6
**document (2)**
51:12;62:9
**documented (3)**
39:25;46:20;61:16
**documents (9)**
23:2;29:3,10,10;
32:14;38:6;43:3;45:7;
68:22
**doesn't (9)**
9:9,12;18:20;21:11;
25:18,21;42:24;
50:25;57:22
**don't (92)**
5:21;7:19;8:1,12;
9:18;10:2,18;11:5;
13:13,17;16:5,11,25;
17:13;18:13;19:15;
21:9,15;22:7,13,21;

65:24;66:7,22;69:14;
73:3;75:19,22
23:23;24:10,12,14,15,
17;25:15,16,25;
26:17;27:1,4,15,22;
28:3,24;29:23;30:15,
24;31:2,4,8;32:6,15;
33:21;34:4;35:21;
36:4,8,17,20,21;37:1,
6,6,14,15;40:19;42:1,
17,25;43:9,14;44:5;
45:22;47:1,1;48:18;
52:7;54:3,16;55:13;
56:10;57:5,6,17;
61:24;62:6;63:12;
67:2;69:3,3,3,6,14;
72:14;74:6;76:3;
77:14,23;78:11
**done (20)**
22:1;23:25;24:19;
25:20;36:25;37:2;
47:15;54:2,9,20;
60:15;64:14,15;65:4;
68:23;69:18;71:6,11;
73:24;75:11
**doubt (2)**
48:24;65:25
**down (16)**
13:20;14:7;53:10;
54:3;56:12,21,21;
57:1;59:15;60:20,23;
61:12;69:15;70:25;
78:9
**downfall (1)**
77:22
**Dr (39)**
4:13,20;5:3;6:10;
7:6;14:18,18,18,19;
15:21,24;34:23;35:9;
37:23;48:17;53:24;
55:22;58:16;60:21,
24;61:9,14;62:2,16;
64:4,19;65:12;66:6,
21;68:11,23;69:1,2;
70:7;73:25;74:9;76:1,
16;78:13
**draft (1)**
39:7
**draw (1)**
18:21
**drawing (3)**
61:2,3,4
**drawn (1)**
57:7
**drill (1)**
70:9
**due (2)**
45:8;61:17
**duly (1)**
11:12
**dura (1)**
15:17
**during (3)**
52:19;61:20;64:16

# E

**earlier (2)**
46:10;74:6
**early (1)**
52:23
**earn (1)**
19:23
**earned (1)**
19:21
**education (2)**
12:8;40:20
**educational (1)**
35:4
**effect (2)**
45:25;63:4
**either (1)**
15:13
**element (1)**
40:25
**else (5)**
21:15;35:15;56:1;
72:9;73:9
**Elshihabi (4)**
15:21;48:17;68:23;
69:1
**email (3)**
28:15;31:25;32:3
**Emory (6)**
12:1,6,7,8,9,10
**employ (1)**
19:5
**employees (1)**
19:5
**employment (1)**
12:12
**enclosed (1)**
29:9
**encompass (1)**
26:20
**ended (1)**
21:14
**endings (1)**
70:6
**energy (4)**
40:14,17;41:25;
47:25
**engineer (3)**
41:11,18;42:5
**engineering (1)**
13:6
**enlarged (1)**
46:15
**enlargement (1)**
46:16
**enough (3)**
43:25;44:2;75:12
**ensure (1)**
64:1
**entire (1)**
48:13
**especially (3)**
54:9;58:6;77:24
**Essentially (1)**
14:23
**estimate (1)**
27:21
**e-tran (2)**
78:21,22
**evaluating (1)**
25:21
**even (12)**
13:13;20:13;22:15;
49:7;55:16,17;63:5;
70:14,14;71:13;
74:18;75:20
**event (4)**
51:5;59:18,19;
60:13
**everybody (2)**
50:3,3
**evidence (3)**
75:6;76:3,5
**exacerbated (1)**
76:17
**exacerbation (1)**
73:4
**exact (2)**
19:15;52:24
**exactly (8)**
17:13;39:24;41:4;
43:7;53:6;63:25;
66:22;72:5
**examination (4)**
58:14;61:15,18,20
**examinations (1)**
58:15
**examine (2)**
58:4;77:19
**examined (2)**
11:13;34:13
**example (1)**
19:20
**except (2)**
6:5;61:3
**exhausted (1)**
16:21
**exhibit (7)**
8:19;37:21,22,24,
25;38:3,7
**exist (1)**
49:4
**exists (1)**
31:4
**exorbitant (1)**
7:20
**expect (1)**
57:14
**expected (2)**
61:6;67:17
**experience (4)**
13:1,15;55:3;63:7,
13,19
**expert (1)**
23:12
**expertise (1)**
44:25
**explain (3)**
57:20;66:7;69:8
**explore (1)**
57:2
**extended (2)**
62:23,25
**extent (1)**
52:18
**extra (2)**
11:1;17:2
**extremities (2)**
58:23;61:10
**extremity (4)**
57:17;58:16,19;
61:3
**eyes (1)**
65:21

# F

**facet (10)**
59:13,14,16;65:5,5;
70:7;71:1,12,14,19
**fact (9)**
21:3;38:20;42:23;
43:3,4;52:6;53:1;
71:6;76:15
**factor (1)**
19:6
**factors (4)**
13:8,10,12,13
**f-a-c-t-o-r-s (1)**
13:12
**facts (1)**
40:4
**faculty (1)**
35:5
**fair (4)**
50:6;63:6;64:21;
67:2
**fall (34)**
20:11;26:8;31:1;
40:14;41:5,15,18,22,
24;42:3,24;43:1,3,18,
23;44:7,14,23;45:17;
51:8;62:2,4,5,11,15;
72:16,18,22,25;73:17,
22;74:2,19;76:9
**Family (1)**
30:4
**far (6)**
9:23;14:13;22:2;
25:21;29:25;42:21
**fashion (1)**
70:24
**faster (1)**
49:21
**favor (1)**
55:19
**Federal (1)**
36:18
**fee (8)**
7:10,24;16:18;
18:12;26:20;28:2,5;
37:24
**feel (2)**
28:22;75:8
**feeling (2)**
55:24;57:1
**feet (1)**
43:9
**fell (3)**
21:2;40:15;45:18
**fellowship (4)**
12:5,9,13;13:4
**felt (4)**
55:9;74:3,4;75:22
**femur (3)**
41:6;45:18,20
**few (4)**
16:2;20:4;23:21;
58:1
**fewer (1)**
62:14
**field (3)**
13:2;40:20;50:1
**figure (2)**
27:1;57:2
**file (3)**
17:18;26:7,25
**files (1)**
26:8
**fill (1)**
57:15
**films (7)**
27:25;30:5,7,8,9;
65:15;74:1
**finalized (1)**
39:8
**find (7)**
17:21;49:4;53:8;
56:8;61:18;76:24;
77:20
**finding (3)**
49:3;60:16,16
**findings (5)**
50:20;59:20;64:25;
65:12;67:5
**fine (1)**
11:7
**finish (1)**
27:7
**finished (1)**
50:8
**firm (3)**
24:7;37:9,15
**first (9)**
6:17;8:22,24;11:12;
20:4;29:1,6;30:23;
38:11
**five (10)**
16:7,24;20:5;22:19;
28:1,6;30:13,15,17;
57:19
**fix (2)**
65:21;66:17
**flat (1)**
26:20
**floor (6)**
39:19;42:12,14,16,
18;45:3
**flow (1)**
58:8
**follow (6)**
38:12,16,19;39:1;
53:1;76:16
**followed (1)**
61:15
**following (1)**
76:22
**follows (1)**
11:13
**follow-up (1)**
27:14
**fool (1)**
49:15
**foraminal (2)**
54:14;59:10
**force (7)**
41:5,9,14,20;42:3,
7;45:19
**forget (2)**
67:21;75:21
**form (4)**
6:6;48:21;53:18;
60:7
**formed (2)**
70:23,24
**forming (1)**
39:18
**forms (1)**
14:12
**forth (1)**
76:1
**forward (4)**
51:1;63:16,17;
75:15
**forwarded (1)**
8:19
**found (4)**
26:12;29:3;67:24;
76:2
**four (4)**
28:1;46:9;48:2;
62:1
**fracture (7)**
41:6,6,7;44:19;
45:20,25;66:15
**fractured (1)**
45:18
**fractures (1)**
66:16
**frame (2)**
52:19;61:20
**frankly (4)**
18:13;24:12;50:21;
57:21

**frequency (7)**
14:14;69:10,16,17;
70:12;71:8,19
**front (1)**
26:1
**full (2)**
11:16;14:10
**fully (2)**
76:9,13
**funny (1)**
28:21
**further (2)**
33:4;78:12
**furthermore (1)**
45:7
**fused (2)**
71:9;72:12
**fusion (28)**
15:5,8;54:8,20;
55:4,5;56:5;64:15,15,
21;65:8;66:24;67:12,
17;68:23;69:2,18;
70:1,6,23;71:2,4,11,
13,16;72:24;75:20,23
**fusions (1)**
69:11
**futuristically (1)**
75:10

**G**

**gather (1)**
35:12
**gathered (1)**
33:25
**gathering (1)**
72:9
**gave (4)**
22:22,23;23:19;
55:17
**general (7)**
19:3;24:1;40:16,18,
24;50:16;65:20
**generated (2)**
8:7;20:15
**genetics (2)**
49:10,13
**Georgia (3)**
12:20;36:6,8
**gets (5)**
40:2;43:13,20;59:5;
64:15
**given (3)**
41:19;75:14;76:15
**gives (3)**
41:8,20;65:14
**glove (1)**
63:24
**goes (3)**
19:22;20:13;30:10
**golf (3)**
45:17,19,24
**Good (12)**

5:2;26:10,19;32:20;
46:1;47:3;58:8,8;
62:9;64:1;67:1,14
**graduated (2)**
12:7,8
**gratefully (1)**
55:11
**Gray (6)**
21:21;24:8;49:11,
13,14;60:5
**great (5)**
4:16;36:20;46:18,
18;55:15
**greater (2)**
7:10;59:13
**greatly (1)**
45:8
**grocery (1)**
45:4
**ground (7)**
41:10,18,21,23;
43:10,13;44:20
**grounds (1)**
22:9
**Group (4)**
30:5;31:21;56:13;
59:25
**grow (1)**
49:20
**growth (1)**
50:9
**guarantee (2)**
55:5,7
**guess (7)**
8:2;21:3;26:16;
38:19,22;58:10;77:18
**guessing (1)**
19:15
**gun (1)**
45:24
**guy (1)**
58:6
**guys (7)**
21:3;26:13;27:13;
41:11;42:6;55:15;
59:5

**H**

**hadn't (2)**
25:9;28:23
**hair (1)**
49:11
**hairs (3)**
49:13,14;60:5
**HAL (2)**
11:11,18
**hands (2)**
77:23;78:2
**happen (2)**
21:12;66:10
**happened (5)**
25:9;31:16;40:8,12;

51:18
**happy (1)**
55:24
**hard (8)**
5:14;22:21;31:3;
45:23,24;53:6;77:21;
78:21
**harder (3)**
47:12;56:8;63:21
**Harvey (20)**
5:7;20:12;24:16;
30:3;34:13;35:7;
38:12;51:8;53:12;
54:4;61:22;62:3,24;
68:4;69:5;73:25;74:9,
25;76:21;77:6
**Harvey's (4)**
41:15;47:14;72:22;
73:16
**hat (1)**
66:6
**hat's (1)**
33:10
**haven't (6)**
24:19;34:3;35:14;
50:9;56:4;78:5
**he's (15)**
15:24;43:17;48:10;
49:15,15,15,18;51:13,
24;53:3;58:9;62:13,
18;65:21;74:23
**head (15)**
8:1;22:20;23:24;
24:11;31:20;33:13;
36:13;37:6;43:16;
44:14,22;48:18;52:8,
22;71:23
**heal (1)**
71:16
**healed (2)**
54:21;56:5
**health (1)**
50:16
**healthy (1)**
73:18
**hear (2)**
5:14;72:10
**heard (1)**
73:3
**help (7)**
40:9;42:6;43:5;
66:21;69:12;74:9;
76:25
**helped (1)**
60:2
**helpful (4)**
44:21;72:4,12;
78:10
**helping (1)**
41:11
**helps (3)**
12:11;32:7;40:12
**herein (1)**

11:12
**herniation (1)**
58:23
**hesitate (1)**
29:11
**higher (2)**
7:20;8:21
**hip (8)**
41:6;45:8,25,25;
56:25;58:11,12,13
**hired (8)**
21:16;22:24;24:7,9,
23;36:12;37:4,10
**history (4)**
50:18;58:7;61:14;
72:23
**hit (3)**
18:20;41:9;44:20
**hitting (3)**
41:21;45:3,3
**hope (2)**
51:22,24
**hopefully (1)**
12:11
**hoping (1)**
55:10
**Hospital (6)**
30:4,5,6,9,9;57:10
**hospitals (1)**
12:10
**hour (4)**
8:22,24;17:1;28:3
**hourly (3)**
16:22;18:9;28:4
**hours (4)**
25:25;27:20,22;
28:1
**house (1)**
41:23
**Huh (1)**
23:2
**human (4)**
13:8,10,11,13
**hundred (4)**
19:16,17,25;28:6
**hurt (1)**
21:11
**hurting (1)**
74:14
**hypertrophy (1)**
59:13
**hypothetically (1)**
75:10

**I**

**I'd (9)**
4:18;26:12;27:13,
13;28:23;38:10;52:7,
22;53:2
**I'll (14)**
5:15,18;7:5;10:23;
23:1;28:21;38:25,25;

52:11;56:3;57:4;66:2,
6,6
**I'm (72)**
4:12;5:6;7:2;8:18;
10:8;11:18;12:24;
13:13,25;16:2,25;
18:24;21:4;22:12;
23:3,4,10,10;25:25;
26:10,18;28:11,15,17;
29:18,20;30:11;31:3,
9,23;32:20;33:2;
34:13;35:4,19,23;
36:5,5,7;37:5,22;
38:18;39:16,23;
41:10,21;42:4;43:14;
45:5;46:7;53:9,9,24,
25,25;54:10;55:2,21,
21,22;56:11;58:8,21;
59:4;64:16;65:7;
66:20;72:9,11;73:24;
77:18;78:8
**I've (10)**
11:23;22:2;36:24;
37:11,12,21;45:16;
54:22;55:21;69:15
**idea (2)**
8:12;22:18
**ideal (1)**
24:1
**identification (1)**
38:4
**III (1)**
11:18
**illness (1)**
77:10
**illnesses (1)**
77:9
**images (3)**
30:2;39:19;42:11
**Imaging (2)**
30:6;66:1
**IME (2)**
24:9,16
**IMEs (1)**
24:11
**immune (2)**
47:16,22
**impact (1)**
72:18
**impart (1)**
57:22
**imparted (2)**
40:17;41:25
**imperative (1)**
74:4
**important (2)**
45:20;77:25
**impression (2)**
11:7;64:6
**inaccuracies (1)**
78:15
**inches (1)**
30:15

**incident (15)**
30:2;31:6;39:19,20,
21;40:2;42:21;45:7;
48:3;52:3,15,20;
53:12,16,17
**include (1)**
20:10
**included (2)**
13:3;29:24;45:13
**includes (3)**
16:18;17:6;20:8
**including (1)**
13:20
**income (2)**
18:16;19:23
**incontinent (1)**
23:10
**increased (7)**
45:15;57:25;60:3;
62:15,17,21;68:5
**independent (2)**
20:15;24:13
**indicate (4)**
6:12;51:20;56:11;
59:2
**indicated (10)**
6:25;44:13;52:14;
56:17;60:22,23;62:5;
71:5;74:1;75:11
**indicating (2)**
18:6;30:14
**indication (4)**
66:24;67:1;70:20;
75:20
**indications (1)**
58:22
**indicative (3)**
56:22;62:17;67:11
**individual (7)**
21:10;31:11;40:1,
13;47:12;73:20,23
**inform (1)**
6:10
**information (4)**
17:17;75:9,12,14
**informed (1)**
6:19
**initial (2)**
26:3;37:17
**initially (1)**
28:17
**inject (1)**
71:17
**injection (3)**
52:23;71:18;77:3
**injured (2)**
31:11;40:2
**injuries (4)**
24:5;35:22;41:8;
44:24
**injury (9)**
20:9;21:18;23:15;
27:23;37:9;51:4;63:2,

10;73:17
**in-person (6)**
7:24;9:2,7,13,22;
10:5
**input (1)**
39:10
**inside (4)**
15:17;65:10,13,25
**instability (6)**
64:20,25;65:6;67:8,
11,19
**instant (1)**
30:1
**instead (2)**
8:23;67:19
**instructions (1)**
57:16
**insurance (1)**
71:25
**intensity (1)**
60:3
**interesting (2)**
23:9;64:11
**interrupt (1)**
26:23
**interrupted (1)**
26:17
**into (4)**
41:11;54:4;58:12;
59:9
**intradural (1)**
15:16
**invasive (2)**
15:9;62:15
**invoice (1)**
32:2
**invoices (3)**
26:25;31:21,25
**involve (2)**
16:5;24:23
**involved (7)**
18:15;20:19,25;
37:3;40:14;41:14;
42:7
**involvement (1)**
18:10
**involving (3)**
33:23;35:18;37:8
**is- (1)**
39:23
**isn't (3)**
44:21,21;63:9
**issue (5)**
7:6;35:25;37:19;
45:10;46:5
**issues (5)**
33:24;47:20;58:24;
63:14;64:4
**it's (93)**
5:23;6:14;7:3,10,
20;8:6;16:12,23;17:4,
4;18:2,2,5,5,19,19;
19:2,3;20:3,13,14;

21:4;24:18,18,25,25;
26:16,16;29:5;31:3,
25;32:16;36:7,21,25,
25;39:1,23,23;40:4,5;
41:1;42:13,15;43:1,6,
6,19,21,24;45:20;
46:1;47:2,10;48:12;
49:8;50:12,13;52:10,
11;53:4,6,10;54:4,8,
15,19;57:10;58:12,
13;60:15,19;63:18;
64:11;65:18;66:2,2,
13;67:1,5;69:9;70:8,
13,24;71:10;72:3;
74:8;76:15,16,25,25;
77:21;78:10

**J**

**January (1)**
60:21
**Jeff (5)**
4:11;5:5;8:17;
26:22;31:24
**Jessica (1)**
29:5
**job (3)**
13:16;55:15;62:9
**joint (2)**
58:11;70:7
**joints (5)**
65:5,5;71:1,14,19
**July (2)**
38:1,8
**jumbling (1)**
64:21
**jump (2)**
61:25;74:21
**jumping (1)**
52:9
**justified (1)**
75:23

**K**

**keep (6)**
26:18;37:1;49:16,
18;56:2,3
**key (1)**
47:4
**kind (22)**
20:12;28:21;30:13,
25;31:3;40:12;41:20;
43:1;44:4,15;46:22;
47:11;49:9;52:25;
53:20,22;57:20;
63:23;64:3,11;68:7;
77:13
**knee (3)**
58:11,11,13
**knowing (2)**
72:22,23
**knowledge (3)**

21:17;57:22;78:7
**Kroger (10)**
5:7;29:7;35:18,22;
36:6,11;37:3,8;38:12;
53:12
**Kroger's (2)**
35:14;37:18

**L**

**L3 (1)**
69:17
**L3-4 (6)**
59:11;70:1,13;71:5;
72:8,11
**L4 (1)**
64:13
**L4-5 (5)**
54:14;59:11;64:10,
13;70:1
**L5-S1 (3)**
54:14;59:9,14
**laceration (2)**
45:2,2
**ladder (2)**
40:16;41:22
**laminectomy (3)**
64:10,13;75:4
**landed (1)**
43:10
**Langenbeck (1)**
14:18
**large (3)**
18:4;46:17;47:6
**last (17)**
14:8;19:14;22:19,
22,23;23:18,18,24,25;
26:3;32:15;34:25;
47:25;57:25;72:15;
75:21;76:7
**late (2)**
34:7;78:10
**later (6)**
11:8;26:4;28:23;
54:11,15;75:11
**laterally (1)**
70:6
**lawsuit (2)**
20:20;38:13
**lawyer (3)**
16:16;25:13;27:23
**lawyers (2)**
26:15;50:21
**lay (1)**
77:23
**learn (1)**
35:5
**learned (2)**
34:23;49:17
**least (5)**
58:16;64:19;65:20;
73:3;75:3
**leave (3)**

7:5;48:19;66:18
**leaves (1)**
66:23
**led (1)**
64:20
**left (5)**
59:2,13;61:4,6;65:5
**left-hand (1)**
43:2
**leg (17)**
56:21,22;57:2,3,8,
23,25;58:5,9;59:3,3,
15;60:22,23;61:7,12,
16
**legs (1)**
54:3
**less (7)**
16:7,14;18:21;20:5;
41:25;63:8,15
**lesser (1)**
59:11
**lesson (1)**
49:17
**Let's (1)**
59:12
**letter (5)**
28:16;29:4,24;30:1;
38:19
**level (6)**
40:14;41:18,23;
66:13,17;71:6
**leverage (1)**
45:24
**licensed (2)**
12:20,22
**life (1)**
50:4
**light (2)**
49:12;54:9
**likely (7)**
59:25;60:6;63:8,15;
73:16,22;74:13
**limited (2)**
22:14;53:16
**Line (3)**
30:7;48:6;56:12
**lines (2)**
45:5;77:15
**Lisle (6)**
32:15,17,18;33:17;
38:20,21
**L-i-s-l-e (1)**
32:16
**list (2)**
36:15,23;37:1;53:4
**listed (1)**
57:18
**lists (1)**
29:10
**little (11)**
5:10;16:3;17:4;
18:3;33:18;34:7;
43:15;49:12;54:8,10;

Case 1:20-cv-04803-CAP    Document 56    Filed 04/21/22    Page 90 of 96
THOMAS HARVEY vs.
THE KROGER CO.
The remote video-conference deposition of HAL SILCOX, MD
October 5, 2021

66:25
**located (1)**
32:1
**location (3)**
4:14,21;36:6
**long (5)**
11:22;12:2;18:2;
43:12;44:2
**longer (1)**
74:23
**look (12)**
23:22,23;26:5;27:6;
28:9,20;52:7,22;53:2;
56:8;65:25;68:20
**looked (4)**
39:25;54:17;57:4;
64:7
**looking (8)**
8:18;39:21,24;
44:17;45:5;58:19,21,
22
**looks (2)**
8:16;43:20
**loss (1)**
47:22
**lost (1)**
26:18
**lot (17)**
16:23;17:4,12;18:4,
5,7;24:4,11;47:21;
49:6,11;50:1;54:5;
55:13;63:3;66:1;
72:14
**low (3)**
56:14,23;61:11
**lower (8)**
51:10;56:24;58:22,
24;61:10;68:9;72:17;
73:21
**lumbar (8)**
14:1,9,10,12;15:8;
51:14;54:22;55:4

**M**

**magnitude (1)**
72:25
**main (2)**
33:25;65:24
**major (4)**
47:19;48:1;63:2;
68:25
**majority (2)**
13:23;16:13
**makes (3)**
18:22;64:12;70:13
**malpractice (2)**
23:12,15
**manage (1)**
77:16
**management (8)**
14:22;15:9;76:21,
24;77:1,5,6,15

**manager (1)**
44:2
**manner (2)**
44:21;75:11
**many (5)**
14:5;19:5;22:18;
24:1,2
**March (2)**
68:22,22
**mark (1)**
54:7
**marked (1)**
38:2
**material (1)**
42:18
**matter (5)**
18:15;25:19,21,24;
79:3
**matters (1)**
16:5
**maturing (1)**
50:9
**may (34)**
10:7,16;11:4;14:7;
20:9;22:3;27:6;28:2,
15;29:20,22;32:12;
34:21,22;35:3,3,3,6,
21,21,22;48:17;51:4;
52:9,9;54:11,21;
55:17;62:6,23;63:14;
65:11;66:6,9
**maybe (16)**
18:6;19:16;20:3,3;
21:13;27:8,9;30:12;
31:22;50:19;52:23;
56:6,6;70:12,24;77:3
**MD (1)**
11:11
**mean (31)**
5:23;7:14;9:17;
11:1;13:24;14:25;
20:2,2;22:20;25:4;
31:3;38:17;40:11;
41:21;46:12;49:25;
50:25;52:10,10;
53:21,22;57:1;58:5,
10;60:15;61:24;66:9;
67:21,23;71:24;77:21
**meaning (1)**
48:12
**means (10)**
27:22;30:11;35:24;
48:10,12;50:13,25;
57:21;63:2,4
**meant (2)**
69:16;74:9
**mechanical (1)**
48:25
**medial (4)**
71:17,18,21;72:1
**medical (12)**
12:8;23:12,15;30:5;
34:18;38:13;39:22;

40:10,11;46:21;
56:13;72:22
**medication (2)**
62:21;63:4,15;64:5
**medications (5)**
62:10,12,22;77:3,
14
**Medicine (1)**
30:4
**mention (2)**
32:3;54:2
**mentioned (2)**
64:14;76:15
**met (1)**
34:13
**middle (1)**
28:19
**might (5)**
15:4;54:10;65:15;
67:11;71:16
**might've (1)**
6:23
**mild (2)**
59:10;74:18
**mind (3)**
51:7;66:3;74:17
**mine (1)**
49:12
**minor (1)**
63:2
**minus (1)**
41:19
**minute (1)**
16:24
**minutes (2)**
16:3;26:14
**miss (1)**
6:24
**missed (1)**
56:6
**mistake (2)**
70:1,3
**Moffett (1)**
21:22
**moment (1)**
63:24
**money (3)**
18:22;19:7;20:14
**month (1)**
24:4
**months (5)**
19:18;23:21;33:21;
36:12;47:25
**more (38)**
15:9;16:3;27:16;
28:2;31:9;42:15,24;
43:20;44:17;47:17,
24;48:19;49:2;50:20,
22;51:3,4;53:21;
54:15,18;59:24;60:5,
6,6;63:3,5;72:8,14;
73:16,21;74:4,13;
75:1,6,13,14;77:6;

78:9
**Mortazavi (21)**
15:24;34:23;35:10;
53:24;55:22;58:16;
60:21,24;61:9;62:2,
16;64:4,19;66:6,21;
68:11;69:2;70:7;
73:25;74:9;76:1
**Mortazavi's (3)**
61:14;65:12;76:16
**most (10)**
24:5,23;26:8;28:3;
49:10;54:12,15;
63:19;74:22;77:25
**motion (3)**
48:25;49:6,8
**motor (2)**
40:3,15
**mouthful (1)**
54:22
**move (3)**
34:11;63:15,17;
64:8;75:15
**moved (1)**
62:20
**moving (3)**
50:14;51:1;60:20
**MRI (7)**
54:11,16;59:9,21;
60:6,10,12
**MRIs (1)**
65:25
**much (15)**
18:6;25:1,23;29:12;
40:17;41:9,20;42:15,
24;43:20;45:1;53:6;
68:8;69:8;74:14
**muscular (1)**
57:1
**myself (1)**
52:10
**mystery (1)**
23:9

**N**

**name (5)**
5:5;11:16;21:5;
32:16;36:3
**nature (1)**
14:15
**necessarily (5)**
19:9;25:20;50:25;
53:5;75:2
**necessary (1)**
75:20
**neck (15)**
51:10,21;53:13;
56:14;68:5,8,17,24;
72:17;73:1,13,21;
76:17,17,19
**need (8)**
14:25;15:5;20:7;

26:21;27:5,16;36:22;
76:23
**needed (4)**
54:2,18;61:22;71:6
**nerve (5)**
58:24;59:10;70:8,
21,22
**nerves (4)**
58:6;70:12;71:1,1
**neurogenic (1)**
58:5
**neurological (2)**
61:17,20
**Neurology (1)**
30:5
**neurosurgeon (2)**
15:13,18
**next (7)**
23:14;39:16;48:5;
61:8,25;64:18;69:7
**nice (1)**
23:7
**nine (1)**
12:3
**nonetheless (3)**
26:17;54:17;74:18
**non-invasive (1)**
14:13
**non-opioid (1)**
77:3
**non-video (2)**
7:12,21
**normal (4)**
46:15;50:8,11,14
**normally (2)**
27:22;31:7
**notation (3)**
53:2;58:18;62:8
**note (9)**
53:5;57:13;58:2;
59:4;64:23;65:3;66:8,
19;78:15
**noted (5)**
46:1;59:11;61:9;
67:9,24
**notes (8)**
52:25;53:1;58:14;
64:7,11;68:7,21;69:4
**Notice (6)**
6:12;10:15;17:16;
37:23,23;59:20
**November (3)**
56:13;57:6,11
**number (11)**
11:5;19:15,19;20:8;
37:24;38:3,3,4,7;
41:16,25
**numbers (2)**
8:1;14:3
**numbness (1)**
57:21

# O

**o0o (1)**
79:4
**obese (1)**
50:18
**Object (2)**
48:21;53:18
**objection (1)**
7:3
**objections (5)**
4:19,22,24;5:23;6:5
**obscured (1)**
59:5
**obviously (22)**
5:23;10:24;29:13;
31:5;39:23;40:12;
44:18;47:6;49:25;
50:17;53:21;55:7;
61:1,13,15;62:12,20;
63:17;68:7,19;77:18,
24
**occasional (1)**
55:12
**Occasionally (1)**
55:11
**occupation (1)**
11:17
**occur (1)**
41:8
**occurred (1)**
37:5
**OCGA (1)**
4:5
**October (1)**
52:15
**Off (21)**
7:25;8:3;22:20;
23:24;24:11;26:24;
30:1;31:20;33:13;
36:13;37:6;38:11;
40:15;41:23;43:16;
48:18;52:8,21;70:10;
71:23;78:25
**offer (2)**
22:10;42:9
**offering (2)**
37:17;42:22
**office (10)**
8:3;9:3,17;10:10,
17;18:21;19:2;29:6,
16;37:18
**often (3)**
24:23;55:11;66:10
**old (2)**
50:14;73:18
**older (2)**
47:12;50:5
**one (25)**
8:23;10:20;17:2;
18:3;22:23;23:1,21,
24;24:4,15,17,19,20;

28:25;31:5;32:14;
35:24;36:17;44:10;
45:3;57:24;62:5,18;
67:10;69:5
**ones (2)**
30:22,23
**ongoing (2)**
62:13;77:12
**only (9)**
18:3;33:14;38:8;
39:4;43:9;45:20;48:2;
71:4,15
**op (1)**
64:19
**open (2)**
23:7;47:10
**operation (3)**
48:1;64:16;70:19
**operative (5)**
64:22;65:3;66:7,19;
75:19
**opinion (10)**
60:24;61:21;72:21;
73:24;74:10,13,20;
75:17;76:8,16
**opinions (12)**
22:10;33:1;34:3,4,
9;37:17;39:18;42:22;
45:10;46:6;55:2;78:5
**opioids (7)**
62:13,14,15,25;
63:21,23;77:2
**opportunity (1)**
65:14
**opposed (3)**
19:13;60:13;69:2
**opposing (1)**
24:9
**order (6)**
28:12;30:11,11,12;
45:9;46:4
**original (1)**
10:14
**Ortho (1)**
11:25
**Orthopedic (3)**
10:3;11:18;14:17
**Orthopedics (6)**
11:21;15:24;18:17,
18;30:7,8
**others (1)**
30:21
**otherwise (4)**
15:18;49:3;50:16;
51:25
**out (16)**
10:15;17:21;26:2;
27:1;28:8;44:18;49:6,
8,9;55:18;56:8;57:2,
16;65:2,4;68:8
**outcome (3)**
55:19;56:9;64:2
**outcomes (2)**

47:3;63:21
**outpatient (1)**
34:25
**outside (3)**
19:14;20:14;65:22
**over (12)**
7:16;8:9;19:17;
24:14;28:17;31:22;
34:23;45:16;57:25;
60:1;69:5,5
**overall (1)**
49:25
**overhead (7)**
18:20,25;19:3,4,5,8,
22
**own (3)**
15:18;19:4;55:15

# P

**page (6)**
30:10;53:3;56:11;
72:15,16;76:7
**paid (1)**
18:14
**pain (69)**
14:22;15:9;30:9;
36:21;45:15;50:25;
51:16,21;52:14,19;
53:3;54:3,3,5,7;56:4,
15,18;57:1,3,16,18,
20,21,25;58:2,5,17;
59:15;60:22,23;61:2,
3,4,9,16,17;62:3,10,
11,13,17,19,21,22;
63:3,8,9,15,22;64:1,5;
68:5,5,24;72:18;73:1,
21;74:8,12,12;76:19,
21,24;77:1,5,6,12,14
**painful (1)**
47:11
**panel (3)**
35:22;36:3,7
**paragraph (6)**
45:6;46:8;48:5;
56:12;60:20;72:15
**paralegal (1)**
29:5
**part (10)**
19:7;31:1;33:19;
41:4;43:10,17;44:24;
52:23;59:5;69:7
**partially (1)**
61:17
**particular (8)**
13:22;14:11;22:15;
26:7;35:15;42:3;
44:19;45:13
**partners (1)**
14:16
**party (2)**
24:9;37:4
**pass (1)**

13:5
**past (4)**
21:24;36:12,22;
64:5
**patient (32)**
19:13;20:11,13,19,
25;21:2,17;35:10,25;
45:17;55:6,23;57:23;
61:9;63:8;65:10,13;
66:22,25;67:14,15;
74:4,25;75:7;76:20,
24;77:13,16,19,19,23;
78:1
**patients (25)**
14:24;15:4,7,12,20,
23;16:5,6;18:20,24;
19:1;20:8,10;41:22;
47:3;50:7;55:8,12,21;
59:14;63:15,17,20;
77:7,8
**pattern (1)**
25:5
**Paul (2)**
23:2,11
**Paulding (5)**
30:4,5,6,6;57:10
**pay (5)**
10:25;24:12,14;
71:25;72:2
**paying (3)**
19:7,22;45:1
**Peachtree (7)**
10:3;11:21,25;
14:16;15:24;18:16,18
**peel (2)**
42:14,15
**pelvis (1)**
41:7
**people (11)**
28:3;41:5;45:16;
49:5,9;50:1,22;53:21;
58:11;63:14;76:25
**per (2)**
28:3;62:1
**percent (5)**
14:1,1,2;16:4,7
**percentage (1)**
19:11
**Percocet (3)**
62:1,5,11
**perfectly (1)**
73:18
**perform (6)**
14:5,9,15;47:1;
55:4;75:3
**performed (4)**
25:14;70:6;73:25;
74:1
**performing (1)**
67:10
**performs (1)**
46:22
**perhaps (2)**

31:21;54:18
**period (3)**
52:5;62:23;63:1
**periods (1)**
30:22
**permanent (1)**
74:23
**PERNICIARO (24)**
4:24;5:25;6:3,7,9,
22;7:5,13,22;8:16;
9:8,16;26:22;27:8,17;
31:24;32:6,9;48:21;
49:23;53:18;78:13,
17,22
**Perry (1)**
29:18
**person (5)**
6:19;43:19;46:18;
48:19;63:9
**person's (1)**
47:16
**personal (3)**
23:15;27:23;37:8
**personally (1)**
66:2
**ph (2)**
13:11;29:18
**phone (7)**
16:19,24;17:7;
31:15,18;32:12,25
**physiatrists (1)**
14:19
**physical (5)**
47:14;61:14;72:23;
73:16;77:2
**physically (1)**
53:5
**pick (1)**
47:5
**picked (1)**
47:7
**picture (2)**
43:21;59:5
**piece (1)**
36:24
**pills (2)**
63:8,10
**pinched (1)**
70:21
**pixelated (1)**
71:14
**place (5)**
24:24;25:4;31:19;
35:6;48:15
**places (1)**
58:12
**plain (1)**
65:1
**Plaintiff (7)**
4:23;16:9,12,14;
21:5,11;55:18
**plaintiff's (3)**
21:4;26:16;37:22

Case 1:20-cv-04803-CAP    Document 56    Filed 04/21/22    Page 92 of 96

THOMAS HARVEY vs.                                    The remote video-conference deposition of HAL SILCOX, MD
THE KROGER CO.                                                                                October 5, 2021

**Plaintiff's (2)**
38:3,7
**plan (1)**
10:14
**play (1)**
68:8
**please (3)**
33:11;78:18,23
**pleased (1)**
56:8
**plucking (1)**
49:14
**pm (4)**
4:2,7;79:1,3
**pocket (2)**
23:6;45:18
**point (15)**
5:13;27:10,11;33:4,
6,11;34:16;37:16;
39:14;50:4;51:6;52:1;
55:14;60:14;76:12
**police (3)**
40:3;45:9;46:3
**policies (2)**
9:18,18
**policy (4)**
7:9;8:2;10:6,18
**Pollydore (1)**
14:18
**portion (2)**
19:21;22:15
**position (1)**
65:3
**possible (7)**
43:22,24;44:11;
54:19;60:15,17,19
**post (2)**
48:6,10
**posterior (1)**
70:6
**postoperative (1)**
67:19
**potential (1)**
58:23
**practice (14)**
11:24,25;12:20,22;
14:1,25;15:2,13,14;
16:4;19:9;20:4,5;
25:18
**practicing (2)**
20:6;37:12
**predict (1)**
63:21
**preexisting (2)**
68:19;73:20
**pre-existing (3)**
72:17,19;73:18
**pre-injury (2)**
76:10,13
**preoperative (1)**
67:18
**pre-operative (1)**
65:1

**presented (1)**
64:3
**presents (1)**
16:16
**Presumably (3)**
21:7;45:23;50:11
**presume (6)**
5:18;42:16,18;
50:16;62:18;73:15
**pretty (2)**
29:12;69:8
**prevented (1)**
69:11
**previous (2)**
39:1;48:11
**primarily (1)**
16:8
**primary (1)**
47:6
**prior (4)**
37:16;39:2;62:4;
73:11
**probably (28)**
7:18;8:3;13:24,25,
25;14:1,7;16:13,24;
19:15;20:4;21:1,2;
24:3;28:13,13,18;
30:15;31:21;47:20;
49:1,10;51:21;61:23;
63:3;69:4,16;71:15
**problem (9)**
7:15;9:1;38:10;
56:6,23,24,25;57:1;
58:16
**problems (5)**
47:18;50:22;52:2;
58:11;73:11
**procedure (6)**
15:10;46:22,25;
47:9,11,15
**procedures (5)**
14:10,14,15,20,22
**process (4)**
41:2;51:1;74:16;
75:5
**Produce (2)**
37:23;65:6
**produced (2)**
37:24;39:4
**producing (1)**
38:18
**professional (1)**
50:19
**profusely (1)**
44:8
**program (1)**
35:4
**prompted (1)**
67:3
**provide (4)**
16:11;17:22;39:7;
42:21
**provided (4)**

5:11,13;21:17;43:2
**providers (1)**
34:19
**pulses (1)**
58:8
**purpose (1)**
5:9
**purposes (1)**
25:21
**put (3)**
26:7;49:1;60:4

## Q

**qualified (2)**
22:10;42:8
**qualify (2)**
42:2;71:10
**quantify (1)**
42:2
**quick (2)**
27:6;53:8
**quite (6)**
18:13;24:11;50:21;
57:21;64:16;65:7

## R

**racks (1)**
45:4
**radial (7)**
14:14;69:10,16,17;
70:11;71:8,19
**radiates (1)**
61:10
**radicular (3)**
56:18,20;59:3
**radiculopathy (2)**
57:14;58:22
**radiographic (1)**
74:17
**radiologists (1)**
60:1
**ramp (1)**
63:5
**range (3)**
14:10;42:6;47:14
**rapidly (1)**
49:2
**rare (2)**
66:2;77:4
**rate (3)**
7:21;8:18;18:9
**rates (2)**
8:17,20
**reach (1)**
28:8
**read (5)**
30:1;59:4;64:12;
65:3,19
**reading (5)**
44:12;54:9;59:9;
64:6;67:6

**real (3)**
44:16,21;53:8
**realized (1)**
23:6
**really (22)**
16:11;23:7,11,11;
24:14;25:1;26:13;
36:20;42:14,25,25;
43:14;44:16;45:1,22;
48:18;50:9;57:22,23;
60:4;64:6;67:4
**reason (8)**
34:1;45:13;46:1;
49:9;65:24;67:17;
71:7;74:14
**reasonable (1)**
73:15
**reasoning (1)**
70:5
**reasons (2)**
74:8;76:1
**recall (22)**
21:16;24:17,21;
25:15,16;30:24;33:5,
21;35:8;36:14;43:11,
14,17;44:5,9,12;
48:18;52:4,8,24;69:3;
71:23
**receive (2)**
18:15;19:12
**received (6)**
13:7;17:18;18:4;
30:22;34:6;53:17
**receiving (5)**
51:15;52:19;53:16;
68:4,16
**recent (3)**
54:12,15;59:21
**recently (1)**
30:19
**recommend (1)**
76:20;77:7,11,16
**recommendation (3)**
63:24;64:8,12
**recommended (4)**
25:3;63:18;64:9;
69:10
**record (13)**
4:6,18;11:17;12:12;
18:4,9,14;26:24;28:3,
4;53:6;77:22;78:25
**recorded (5)**
6:11,13,14;8:21;
9:10
**recording (1)**
7:2
**records (45)**
16:10,11,17,19,20;
17:2,5,12;18:4,5,7;
20:15;26:3,5;27:25;
28:10,12,17,20;29:4,
14,25;30:11,12,18,24;
31:3,10,13,14;34:2,3,

6;37:17;38:13,18;
39:22;40:9;44:12;
46:21;48:16;59:1;
67:3;68:1;76:16
**recover (1)**
47:11
**recovered (1)**
55:9
**recovering (2)**
47:18;72:24
**recovery (3)**
47:8,12,21
**refer (4)**
15:1,4,17;56:1
**reference (3)**
38:20;54:18;72:11
**referenced (1)**
29:7
**references (1)**
72:8
**referred (7)**
15:7,12,20,23;
58:12,13;59:15
**reflect (1)**
26:6
**regarding (2)**
39:18;68:12
**regards (3)**
21:10;31:11;40:11
**region (3)**
36:8;46:13;51:14
**regular (1)**
14:17
**rehabilitative (1)**
77:1
**re-injuring (1)**
48:20
**relevance (2)**
45:10;46:5
**relevant (2)**
58:2;78:6
**relief (3)**
55:5,9;56:4
**remained (1)**
75:4
**remember (13)**
18:13;21:9,19;
22:21;23:23,24;25:1;
35:1;39:24;44:15;
49:21;54:16;68:21
**remote (3)**
4:13,21,21
**remove (2)**
70:7,8
**removed (3)**
48:12,14;71:12
**repair (2)**
47:4,10
**repaired (1)**
46:19
**rephrase (1)**
5:16
**replacement (3)**

49:4,5,7
**report (45)**
5:11;16:2;17:9,25;
18:2;26:4,5;30:2;
33:1,7,11;34:12;
35:17;37:25;38:8,13,
23,25;39:1,2,4,11,19,
21,24;40:2,4;42:12;
45:7,14;52:9;53:22;
54:2,10,11;61:11;
64:19;68:11;69:7,14,
25;75:18,19,22;76:2
**reporter (6)**
4:3,11,17;78:19,20,
24
**reports (3)**
31:6;37:2;40:6
**represent (1)**
48:24
**represented (1)**
37:14
**represents (1)**
29:7
**reputation (1)**
20:6
**request (4)**
20:18;30:25;31:7,8
**requested (1)**
17:16
**requesting (1)**
31:9
**requests (2)**
16:13,23
**require (2)**
17:15;67:11
**required (1)**
62:13
**requirements (1)**
4:4
**requires (1)**
58:14
**requiring (1)**
68:12
**reread (1)**
69:14
**reserve (4)**
6:4,5;78:14,18
**reserving (1)**
5:22
**residency (4)**
12:5,9;13:3;41:3
**resolved (4)**
36:22;76:9,13,18
**rest (1)**
19:22
**restate (1)**
63:13
**result (3)**
22:6;44:7;55:13
**results (1)**
77:13
**Resuming (6)**
27:19;32:10;38:5;

48:23;49:24;53:19
**Resurgens (3)**
30:7,7,8
**retainer (2)**
16:18;18:1
**retrieves (4)**
23:1;29:3;32:14;
68:22
**returned (1)**
76:18
**review (26)**
16:10,17,18,20;
17:7;18:5,10,15;
20:15;25:13,19;26:3,
11;27:22,25;28:4,20;
29:9,13;31:1,14;
34:12;38:12;39:21;
59:1;78:14
**reviewed (7)**
21:23;22:3;31:5;
34:7;38:18;39:18;
75:18
**reviewer (1)**
20:16
**reviewing (5)**
16:4;31:13;40:9;
44:13;66:23
**reviews (4)**
19:21;28:3;38:7;
77:22
**revisions (1)**
39:13
**right (47)**
4:8,17;6:14;8:15;
10:13,22;14:21;15:7;
18:13;27:17;28:25;
34:8,11;37:13;39:16;
40:22;41:13;44:1;
49:19,19;50:24;51:7;
55:20;57:8,25;58:5,
24;59:3,8,13,20;61:8;
62:6;65:19,19,20;
66:17;68:14,16;70:2,
4;71:3,21;72:3;75:13;
78:4,14
**ring (1)**
62:7
**risk (2)**
46:18;49:2
**rongeur (1)**
70:10
**roof (1)**
41:23
**root (1)**
59:10
**roots (1)**
70:21
**rough (2)**
14:3;22:18
**ruled (1)**
44:18
**running (2)**
37:1;54:3

rupturing (1)
46:18
**rushed (1)**
74:10
**Rust (2)**
21:21;24:8

**S**

**S1 (1)**
64:13
**sacrum (1)**
69:18
**safe (2)**
24:18;37:2
**same (10)**
8:10;18:20;37:9;
55:22;58:1;60:20;
63:20;66:5;75:2,11
**Sandy (1)**
36:7
**Sarah (2)**
32:15,17
**satisfaction (1)**
55:14
**satisfied (2)**
55:13,16
**Savannah (1)**
36:6
**saw (4)**
45:16;64:4;67:15;
76:21
**saying (7)**
25:15;47:14;53:24;
65:18;67:24;70:5,19
**scalp (1)**
45:2
**scans (2)**
65:25
**scene (1)**
40:3
**schedule (4)**
7:10;18:12;28:2;
37:24
**Schiff (1)**
14:18
**scientific (1)**
40:25
**scientifically (1)**
41:13
**scoliosis (1)**
65:2
**scrambled (1)**
52:25
**screen (1)**
57:5
**Sean (1)**
29:18
**second (6)**
23:1;26:23;32:14;
45:6;48:6;56:11
**seeing (8)**
18:20,24;19:1;

43:17;59:12;60:14;
67:25;78:1
**seem (1)**
50:22
**seemed (1)**
64:19
**seeming (1)**
77:13
**seems (3)**
44:9;52:6,22
**send (11)**
10:24;26:24;27:3;
28:9,12;29:17;30:21;
31:8,22;76:24;77:14
**sends (1)**
24:14
**sense (6)**
17:1;18:22;41:20;
45:20;70:13;71:13
**sent (9)**
24:15;28:15,16,17;
29:14;30:18;31:5,24;
69:15
**sentence (8)**
29:6;38:11;39:17;
45:6;46:3;61:8,8,25
**serious (1)**
58:17
**services (2)**
19:14;20:14
**set (3)**
6:17;76:1,1
**setting (1)**
37:9
**several (1)**
47:25
**severe (1)**
61:9
**sham (1)**
70:19
**share (2)**
14:24;78:6
**sheet (2)**
8:18;26:1
**short (1)**
33:20
**shortly (1)**
60:12
**shouldn't (1)**
38:10
**show (6)**
50:13;52:11;54:3;
57:4;60:7;65:1
**showed (1)**
43:5,5;54:13
**shown (1)**
46:14
**shows (3)**
28:22;31:2;53:3
**side (2)**
26:15,16
**signal (1)**
60:3

**signature (1)**
78:18
**signed (1)**
8:3
**significant (5)**
44:16;51:8;53:12;
67:15;68:13
**Silcox (8)**
4:20;5:3;6:10;7:6;
11:11,18;37:23;78:13
**simple (1)**
16:24
**sit (1)**
50:21
**sitting (2)**
10:9;43:22
**situation (1)**
21:13
**situations (2)**
21:16;22:13
**six (2)**
26:14;30:15
**size (2)**
46:15,17
**skeletal (2)**
50:9;58:10
**skip (1)**
56:10
**skull (2)**
13:20,20
**slightly (1)**
8:21
**slip (2)**
20:11;45:17
**slippage (1)**
67:16
**slipping (1)**
65:2
**smaller (1)**
19:4
**smoker (1)**
50:17
**Solutions (7)**
30:9;51:17;52:14,
19;53:4;62:4;69:10
**somebody (18)**
10:11;26:11;40:2,5,
15;43:5;50:18,18,21;
62:17,22;63:7;71:4,
11,17;73:1,17;77:11
**somehow (1)**
6:24;23:2;71:14
**someone (7)**
21:15;29:16;47:7,
13;58:3;70:13;73:15
**someone's (2)**
39:22;48:12
**sometimes (3)**
24:6;55:15;58:11
**somewhat (1)**
50:14
**somewhere (3)**
45:2;56:1;78:9

THOMAS HARVEY vs.
THE KROGER CO.

The remote video-conference deposition of HAL SILCOX, MD
October 5, 2021

**sorry (5)**
12:24;29:20;32:20;
58:21;72:11
**sort (3)**
45:9;46:4;63:2
**sounds (2)**
11:3;54:20
**source (1)**
74:7
**space (1)**
71:8
**speak (1)**
51:6
**speaking (1)**
41:13
**special (1)**
13:1
**specialize (2)**
13:18;14:11
**specialized (1)**
13:15
**specific (7)**
25:24;33:24;34:24;
40:19;41:16,25;42:7
**Specifically (2)**
19:8;31:12
**specifics (1)**
34:11
**specify (1)**
16:10
**speed (1)**
41:9
**spell (1)**
26:2
**spelled (1)**
32:16
**spend (1)**
27:22
**spent (1)**
25:23
**Spilker (1)**
30:4
**spinal (3)**
13:19;15:16;74:15
**spine (9)**
11:18;12:14;14:12;
15:19;45:1;48:25;
54:22;68:12;76:8
**Spine/Pain (1)**
69:9
**spines (1)**
50:3
**spoke (5)**
32:25;33:16,19,21,
22
**spoken (6)**
32:12;33:15;34:16,
18,21;35:15
**spondylolisthesis (3)**
65:2;67:16,20
**Springs (1)**
36:7
**St (1)**

21:21
**stabbing (1)**
57:20
**stand (3)**
43:6,23;46:17
**standard (1)**
25:18
**standing (2)**
43:18;50:23
**standpoint (4)**
10:3;40:5;50:10;
77:5
**start (3)**
11:9;38:10;70:11
**started (3)**
12:10;26:9;50:9
**starting (1)**
50:4
**starts (1)**
49:14
**state (4)**
11:16;38:11;46:9;
72:16
**statement (3)**
46:3;48:6;63:6
**states (2)**
12:22;45:6
**status (3)**
48:10;76:10,14
**stenosis (4)**
54:14;59:10;74:15,
17
**step (1)**
42:25
**still (8)**
20:12,13;49:6,8;
55:16,19;58:9;72:16
**stipulate (2)**
4:19;5:22
**stipulation (1)**
4:12
**stop (1)**
52:5
**stopped (1)**
52:1
**stopping (1)**
27:10
**store (2)**
40:1;45:4
**strange (1)**
23:11
**stricken (2)**
22:6,11
**struck (1)**
44:16
**study (1)**
41:3
**subject (1)**
19:3
**subjective (1)**
61:14
**suffer (2)**
51:5;73:16

**suffice (1)**
53:25
**suggest (4)**
53:22;54:19;58:15;
73:3
**suggestive (1)**
60:3
**suggests (1)**
64:13
**suit (2)**
23:13;27:23
**supervisor (1)**
39:25
**supplied (1)**
18:12
**supply (1)**
17:14
**supported (3)**
67:5,9,25
**supposed (4)**
6:18;40:5;57:15,18
**sure (24)**
5:16,25;20:21;21:8;
23:3;28:9,17;29:18;
33:2;35:19;36:5,5;
37:5;41:10;42:4;
43:14;47:5;51:11;
52:1;55:22;56:10;
63:25;77:18;78:8
**surgeon (12)**
11:19;12:15;13:16;
34:24;46:22,23;55:4;
65:9,13,20;66:23;
77:25
**surgeon's (1)**
65:25
**surgeons (1)**
63:19
**surgeries (7)**
13:18;14:5,9;15:19;
24:24;25:9;49:4
**surgery (50)**
12:14,18;13:19;
14:12;15:8;19:2;25:2,
3,3,4,14,20;34:24,25;
47:13,20,21;48:11,15;
53:23,25;54:1,6,19;
55:10,25;62:21;63:9,
16,18,19,21,24;64:8,
9;65:14,22;66:10;
67:10;68:19,21;
72:24;73:25;74:5,10,
22,22;75:9;76:3,22
**surgical (4)**
13:23;14:13;25:7;
75:22
**surprising (1)**
69:9
**susceptible (3)**
47:17;48:20;51:4
**swearing (2)**
4:13,20
**sworn (2)**

5:1;11:13
**symbols (1)**
57:19
**symptomatic (1)**
60:8
**symptoms (4)**
56:21;59:3;76:17;
77:17
**syndrome (1)**
59:15
**system (2)**
47:16,23

**T**

**talk (9)**
5:10;33:22;34:12;
38:9;55:14;58:19;
60:21;61:25;72:7
**talked (8)**
28:13,14;32:23;
35:9;38:20;67:8;74:6;
78:5
**talking (4)**
38:14;56:12;72:9;
78:1
**target (1)**
50:14
**tear (5)**
59:8,23;60:4,7,14
**tears (1)**
59:24
**ten (3)**
25:25;27:20,22
**tends (1)**
50:5
**terminal (4)**
77:6,7,8,9
**testified (8)**
20:17,23;21:25;
22:19;35:17;36:16;
37:3,7
**testify (7)**
5:8;21:10,17,19;
22:9;23:15;24:22
**testifying (2)**
25:10;36:10
**testimony (7)**
5:12;7:11,12;22:2,
5,14,16
**Thanks (1)**
4:16
**that's (70)**
5:14;6:7;8:5,6;
9:14;10:8;11:7;19:6,
18;21:3;23:7,11;
24:25;25:1;29:4,12;
30:12;31:1,20;32:19;
38:9;40:14;41:3,23;
42:4;43:11;45:23;
46:16,19;49:19,19;
50:11;53:20;54:21;
57:7,15;58:21;59:11;

60:8;61:13,16;62:24;
63:6,6;64:1,12,13,22,
22;65:6;66:18,25;
67:2,3,18,21;68:13;
70:1,1,3,9,19;71:8,20;
72:3;75:9;77:4,7,9,22
**theirs (1)**
57:18
**theory (1)**
49:1
**therapy (1)**
77:2
**there's (27)**
6:17;7:3;9:19;
18:21;25:5,16;30:10;
32:2;41:25;43:24;
47:21;48:24;49:7;
51:7;53:23;55:13;
60:1,2,9;65:25;66:10,
24;67:1;70:14,20,22;
75:12
**therefore (1)**
74:10
**they'll (2)**
16:11;50:25
**they're (21)**
10:23;14:19;21:11;
24:6;25:7,9;30:14;
47:3,18,23,24,24;
49:6,8;50:20;55:24;
56:8;59:25;72:1;73:1,
21
**they've (1)**
30:18
**thick (1)**
30:15
**thinking (2)**
10:9;49:14
**third (3)**
45:6;56:12,12
**third-party (1)**
24:13
**thirty (1)**
19:17
**thirty- (1)**
28:5
**Thomas (3)**
5:6;30:3;38:12
**thoracic (3)**
14:2;51:11,13
**though (6)**
9:10;20:13;36:9;
49:7;55:17;64:7
**thought (3)**
62:4;71:14,16
**thousand (5)**
8:23;19:16,17;20:1,
5
**throughout (4)**
68:3,6,11;75:4
**tie (1)**
53:5
**timeline (1)**

THOMAS HARVEY vs.
THE KROGER CO.

54:13
**timer (1)**
43:15
**times (7)**
20:3;22:18;24:4,5;
26:10;36:24;49:6
**tip (1)**
66:6
**today (4)**
8:20;54:17,17;78:5
**today's (1)**
33:23
**together (1)**
36:24
**told (8)**
8:9;9:2,13,14;
25:12;28:5;33:17;
68:14
**tolerances (1)**
63:22
**took (7)**
20:11;25:4;26:2;
31:18;44:2;48:15;
65:4
**top (13)**
7:25;22:20;23:24;
24:11;31:20;33:13;
36:13;37:6;43:16;
48:18;52:8,21;71:23
**topic (1)**
64:18
**total (1)**
17:18
**totally (2)**
31:10;70:13
**towards (3)**
19:7;62:20;64:8
**town (1)**
20:6
**training (2)**
13:2,15
**transcript (2)**
30:2;78:15
**trauma (2)**
51:5;59:21
**traumatic (5)**
51:5;59:17,19;
60:13,16
**traveling (2)**
60:23;61:12
**treat (4)**
55:25;60:25;63:10;
71:5
**treated (5)**
20:19,24;21:14;
35:7;62:3
**treating (5)**
16:5;21:15;52:2;
60:24;63:7
**treatment (23)**
21:17;30:10;36:1;
40:10,11;47:4;51:15,
24;52:18;53:7,15,17;

61:21;62:13,16;67:4;
68:3,11,13,17;74:5;
75:1;78:1
**triple (1)**
47:3
**true (1)**
51:3
**try (9)**
5:15;23:23;24:12;
36:23;63:13;70:14;
75:3;76:23;77:16
**trying (10)**
44:19;53:8;55:5;
59:4,6;65:21;66:16,
21;71:25;72:7
**tumor (2)**
15:16,16
**tune (1)**
44:10
**turned (1)**
55:18
**twelve (1)**
19:17
**twelve-fifty (1)**
8:23
**twenty-five (2)**
19:16;20:1
**two (4)**
18:4;30:22;31:25;
45:17
**two-dimensional (1)**
43:21
**two-hour (1)**
11:3
**type (9)**
13:18;34:24;40:25;
47:9,15;56:22;57:13;
58:18;77:3
**types (4)**
13:19;14:15,21;
61:21
**typical (1)**
16:15
**typically (6)**
14:5;17:25;24:22;
39:25;55:25;77:1
**typo (2)**
72:8,12

---

**U**

**unbiased (2)**
24:13;40:6
**unclear (1)**
54:8
**under (2)**
26:8;67:15
**undergoes (1)**
47:19
**undergone (1)**
48:11
**undergraduate (1)**
12:7

**understandable (1)**
54:6
**understood (5)**
5:17,18;20:21;
70:18;74:7
**undertaken (1)**
74:6
**unindicated (1)**
74:11
**uninstrumented (1)**
65:8
**University (2)**
12:6,9
**unless (1)**
15:15
**Unlike (1)**
26:13
**unqualified (1)**
22:14
**unsolicited (1)**
36:2
**unusual (1)**
67:13
**up (35)**
6:18;7:5;11:1;
13:23;20:7;21:14;
25:17;26:18,20;
27:15;28:22;31:2;
33:24;38:12,16,19;
39:1;42:18;43:6,9,13,
20,23,23;47:5,7;
50:19;58:12,20,20;
61:15;63:5;64:21;
69:24;76:16
**usage (1)**
62:21
**use (5)**
8:20;13:16;42:5;
57:17;63:3
**using (1)**
19:20
**usually (17)**
16:19;21:4,11;26:9,
20;27:24,25;28:1,4,
21,22;30:25;36:3;
56:3,8;57:17;66:13
**utilized (1)**
77:2,4

---

**V**

**vactors (1)**
13:11
**validates (1)**
42:23
**value (1)**
60:14
**variant (1)**
10:17
**varies (1)**
20:2
**various (1)**
49:4

**vascular (1)**
46:23
**vasculogenic (1)**
58:6
**vector (1)**
45:19
**vectors (1)**
41:5
**vehicle (2)**
40:3,15
**verbose (2)**
46:7;54:10
**versa (1)**
58:13
**versus (5)**
5:7;7:11;16:9;
41:21,23
**vertebral (2)**
48:13,14
**vessel (1)**
46:16
**vice (1)**
58:12
**video (21)**
6:14;7:11,11;8:9,
21;9:3,10;11:4;22:1,
1;30:2,25;39:20;
42:20;43:2,8,15,17;
44:2,20;72:22
**VIDEOGRAPHER (2)**
4:6;78:25
**videotape (2)**
7:1;9:15
**view (1)**
65:22
**views (1)**
46:6
**vis-a-vis (1)**
36:3
**visit (5)**
56:13,14;57:5;58:1;
60:21
**visiting (1)**
34:24
**volume (1)**
27:21
**vs (1)**
38:12
**vulnerable (1)**
48:20

---

**W**

**waiting (2)**
10:11;60:13
**walking (1)**
50:23
**wants (1)**
63:10
**wasn't (7)**
9:4;44:9;45:1;48:2;
61:16;67:9;74:11
**watch (1)**

44:1
**water (1)**
23:6
**way (13)**
18:20;25:16;26:14;
49:21;55:22,24;
57:15;60:1,2,9;66:18;
68:7;73:3
**we'll (5)**
26:20;34:12;56:8;
78:17,18
**we're (8)**
4:18;10:25;23:5;
38:9,13;49:3,13;63:1
**we've (1)**
56:6
**weak (1)**
51:6
**weakness (1)**
56:18
**weapon (4)**
45:8,21,22,23
**wear (2)**
49:6,9
**wearing (1)**
49:8
**Weathington (2)**
23:2,12
**week (2)**
22:23;23:18
**weeks (2)**
46:9;48:2
**weigh (1)**
47:15
**weight (1)**
41:19
**WellStar (9)**
30:4,4,5,6,6,8,9;
56:13;57:10
**weren't (1)**
22:10
**wet (3)**
23:3,4,5
**what's (4)**
40:6;51:25;65:14;
71:17
**Whereupon (4)**
4:3;11:10;38:2;
79:2
**white (1)**
63:23
**who's (2)**
40:5;50:18
**whole (4)**
43:10,19;56:7;
72:14
**whose (2)**
36:11;62:22
**Wilcox (1)**
4:13
**Wilds (1)**
29:5
**willingness (1)**

29:8
**wish (2)**
  28:23,23
**withdraw (1)**
  75:21
**within (2)**
  47:20;53:5
**without (1)**
  55:16
**Witness (23)**
  5:1,4,20;7:8,18,25;
  8:5,11;9:23;10:1,16;
  11:2,12;21:3,5;23:1;
  29:3;32:14;38:7;
  48:23;53:19;68:21;
  78:16
**won't (1)**
  16:25
**wondering (1)**
  29:1
**words (3)**
  18:24;32:21;70:9
**work (7)**
  11:20,25;12:4;
  13:23;16:8;19:8;
  26:15
**worked (2)**
  11:24;21:21
**worker (1)**
  50:20
**workers' (2)**
  35:25;37:8
**working (2)**
  56:3;65:11
**work-related (3)**
  20:9;24:5;35:22
**worse (1)**
  50:5
**worsening (1)**
  54:13
**would've (11)**
  8:6;21:1;22:1;23:4;
  28:12,14,17;29:18;
  67:20,25;71:5
**wouldn't (1)**
  61:12
**write (2)**
  38:25,25
**writing (3)**
  26:5,10;38:11
**written (7)**
  17:9,25;33:1,7,11;
  35:17;78:9
**wrong (4)**
  53:24;62:6,24;67:1
**wrote (1)**
  68:10

---

**X**

**x-ray (2)**
  50:8,11
**x-rays (5)**

---

46:20;51:12;65:1,
16;67:14

---

**Y**

**y'all (3)**
  26:13,13;36:22
**YASHINSKY  (36)**
  4:8,15,22;5:2,5,6,
  21;6:1,4,8,16,23;7:14,
  23;8:4,8,15,25;9:11,
  21,24;10:13,22;11:6,
  15;27:3,12,18,19;
  32:4,8,10;38:2,5;
  49:20,24
**year (13)**
  14:6,8;19:15,20;
  20:1,2,2,5;24:2;26:3;
  60:13;68:20;73:18
**years (15)**
  11:23;12:3;20:4,4;
  22:19;26:9;34:25;
  37:12,15;50:10,11;
  60:1,6;65:24;68:18
**yesterday (4)**
  17:3;33:16,20;34:7
**you'd (3)**
  58:3;71:15;78:6
**you're (37)**
  5:8;6:15;12:20;
  19:1,8;24:23;25:10,
  20,20;26:15;27:10;
  35:24;42:8,8;49:10;
  50:17,17,18;55:5;
  57:1,15;58:19,21,22,
  23;63:3,4;65:10,10;
  66:15;67:23,25;
  70:19,25,25;72:9;
  76:5
**you've (16)**
  5:11;15:23;26:7;
  30:22;32:22;33:14;
  34:13,16;35:9;36:15;
  37:2,7;39:18;50:8;
  51:3;78:10
**young (1)**
  73:22

---

**Z**

**Zero (2)**
  42:13,13
**Zoom (6)**
  6:21;7:4;8:10;9:4,9,
  9

---

**1**

**1 (2)**
  37:22;38:3
**11th (2)**
  38:1,8
**12 (1)**

---

36:12
**12th (2)**
  29:21,22
**17th (1)**
  56:13
**18 (2)**
  50:8,11
**1983 (1)**
  12:7
**1987 (1)**
  12:8
**1992 (1)**
  12:11

---

**2**

**2 (2)**
  37:24;38:3
**20 (1)**
  73:18
**2012 (2)**
  52:6,11
**2014 (2)**
  48:17;68:22
**2015 (5)**
  52:16,23;56:13;
  57:6,11
**2016 (1)**
  60:22
**2018 (1)**
  54:12
**2020 (3)**
  19:18;29:21,22
**2021 (2)**
  38:1,8
**21 (1)**
  11:23
**21st (2)**
  57:6,11
**250 (1)**
  14:7
**29th (1)**
  52:15

---

**3**

**3 (5)**
  37:21,25;38:4,7;
  72:16
**3:16 (2)**
  4:2,7
**30 (4)**
  20:4;37:12,15;
  41:19
**300 (1)**
  14:7
**32 (1)**
  41:20
**3-4 (1)**
  69:16
**35 (1)**
  14:1

---

**4**

**4-5 (5)**
  69:16,17,18;70:3,
  17

---

**5**

**5 (2)**
  14:2;29:4
**5/12/2020 (1)**
  29:5
**5:01 (2)**
  79:1,3
**5-1 (4)**
  69:17,18;70:3,17

---

**6**

**60 (1)**
  13:25

---

**8**

**8th (1)**
  60:21

---